JACQUELINE McSHANE, Adm'r of the Estate of Craig McShane, Deceased, et al., Plaintiffs-Appellees, v. CHICAGO INVESTMENT CORPORATION, Defendant-Appellant.—CONCETTA HITZ, Adm'r of the Estate of Joseph R. Hitz, Deceased, Plaintiff-Appellee, v. CHICAGO INVESTMENT CORPORATION et al., Defendants-Appellants.

First District (5th Division)   No. 1—90—3249

Opinion filed September 25, 1992.

James B. Davidson, Roderick T. Dunne, and Ivan P. Jecklin, all of Peterson & Ross, of Chicago, for appellants.

Michael W. Rathsack, of Chicago (Patricia C. Bobb, Marina Ammendola, and Michael W. Rathsack, of counsel), for appellees Jacqueline McShane, Louis Outlaw, and Gerald Cathcart.

William J. Harte, Ltd., and Herbert F. Stride, Ltd., both of Chicago (Herbert F. Stride, William J. Harte, and Joan M. Mannix, of counsel), for appellee Concetta Hitz.

JUSTICE MURRAY delivered the opinion of the court:

This is an appeal from a general verdict in favor of plaintiffs, Jacqueline McShane, administrator of the estate of Craig McShane, Louis Outlaw, Gerald Cathcart and Concetta Hitz, administrator of the estate of Joseph R. Hitz, in a negligence action brought against defendants, Chicago Investment Corporation and Madison Maintenance Corporation, for injuries sustained after responding to a fire alarm. The facts are as follows.

On the evening of September 22, 1981, several Chicago firefighters, including Craig McShane (McShane), Louis Outlaw (Outlaw), Gerald Cathcart (Cathcart) and Joseph Hitz (Hitz), responded to a fire alarm at 8 South Michigan Avenue, a 38-floor high-rise building in Chicago. McShane and Outlaw were part of Engine Company 42, Cathcart and Hitz were with Truck Company 1. Although McShane was a probationary fireman, Outlaw had three years' experience, Cathcart had four years' experience and Hitz had 17 years' experience. During the course of the fire, McShane and Hitz died, and Outlaw and Cathcart received extensive burns and other injuries.

Jacqueline McShane, administrator of McShane's estate, along with Outlaw and Cathcart, filed a negligence action against Chicago Investment Corporation (CIC), the sublessee of the building at 8 South Michigan, seeking compensation for the wrongful death of McShane and injuries suffered by Outlaw and Cathcart. Concetta Hitz, administrator of Hitz's estate, filed a separate negligence action against both CIC and their agent, Madison Maintenance Corporation (MMC), which managed and maintained the premises for CIC, seeking to recover for the wrongful death of Hitz. The two actions were consolidated.

After a jury trial, substantial verdicts were rendered in favor of the above-named plaintiffs. The judgments for each of the plaintiffs were reduced by 50%, however, based on the plaintiffs' contributory negligence. CIC and MMC then filed this timely appeal.

On appeal CIC and MMC argue that the verdicts rendered in favor of plaintiffs should be reversed and that this court should enter judgment in their favor because (1) the "fireman's rule" precludes plaintiffs from any recovery, or (2) plaintiffs' negligence was the superceding proximate cause (or their actions an unforeseeable, intervening cause) of their injuries and death. In the alternative, CIC and MMC ask this court to remand for a new trial because (1) the trial court erred in instructing the jury, (2) the trial court erred in making certain evidentiary rulings, or (3) the cumulative effect of various errors warrants the grant of a new trial.

For reasons that follow, we affirm the judgment of the trial court.

■ Perhaps the chief issue presented to this court is the application of the so-called "fireman's rule." The fireman's rule is a doctrine which limits the extent to which firefighters or other public officers may be allowed to recover for injuries incurred when, in an emergency, they enter onto privately owned property in discharge of their duty.

Historically, under common law, a fireman was considered a "licensee" to whom a landowner owed no duty except to refrain from inflicting wilful or wanton injury. Over time, however, courts began to recognize many exceptions to this harsh rule, finding that various circumstances raised the status of the injured fireman to that of an "invitee" or "business invitee." Finally, courts discarded these "legal fictions" altogether and merely held that landowners owed firemen and other public officials a duty of reasonable care to keep their premises safe. See *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 413-15, 170 N.E.2d 881.

This more enlightened approach, giving firemen the right to bring suit for unreasonably unsafe conditions, was adopted by our Illinois Supreme Court in *Dini*. In *Dini*, one fireman was killed and another injured when the wooden staircase they were climbing inside a burning building unexpectedly collapsed. The record showed that the staircase, unaffected by the fire, had been defectively constructed. The court also noted that, unknown to the firemen, a storage room located near the stairwell contained highly flammable products, including paint and benzene. After reviewing the history and case law concerning the duty owed by landowners to firemen, the *Dini* court held that a cause of action could be brought against a landowner or occupier for failure to exercise reasonable care in the maintenance of its property resulting in injury or death to firemen rightfully on the premises, fighting a fire in a place where they might reasonably be expected to

be. The *Dini* court also recognized, as an additional basis of liability, the alleged violations of certain fire safety ordinances.

Although *Dini* recognized that a duty was owed to firemen, *Dini*'s progeny defined the scope of that duty, giving greater clarity to the fireman's rule. The cases that followed *Dini* interpreted the fireman's rule as limiting recovery to those instances where the landowner or occupier breached his duty of care by failing to keep the premises safe so as to prevent injury to firemen resulting from causes *independent of the fire*. A landowner was deemed not liable, however, for any negligence giving rise to the fire or other emergency which brought the firefighter or public official onto the private property.

In other words, a fireman has no right of recovery for injuries arising out of the fire itself. See *Court v. Grzelinski* (1978), 72 Ill. 2d 141, 147-48, 379 N.E.2d 281 (and cases cited therein); *Young v. Toledo, Peoria & Western R.R. Co.* (1977), 46 Ill. App. 3d 167, 360 N.E.2d 978; *Washington v. Atlantic Richfield Co.* (1976), 66 Ill. 2d 103, 361 N.E.2d 282; *Erickson v. Toledo, Peoria & Western R.R.* (1974), 21 Ill. App. 3d 546, 315 N.E.2d 912.

As stated in *Court v. Grzelinski*:

"This distinction evolved for two mutually supportive reasons. First, since most fires occur because of the negligence of the landowner or occupier, it was believed that the imposition of a duty to prevent fires from occurring or spreading on a person's premises would place an unreasonable burden upon the person who owned or occupied improved land. [Citations.] This public policy consideration, however, tended to undermine the general duty imposed upon landowners or occupiers to exercise reasonable care to keep their premises safe. A compromise was reached with regard to firemen, recognizing that the risk of harm from fire is inherent in a fireman's occupation." *Court v. Grzelinski*, 72 Ill. 2d at 148.

In light of the above-stated case law, the fireman's rule has been refined to mean that when a fireman enters upon a person's property to fight a fire, he assumes the risk of being injured by causes related to the fire. He does not assume, however, the risk of being injured by causes unrelated to the fire, *i.e.*, causes that might be faced by an ordinary citizen entering upon the property. *Hedberg v. Mendino* (1991), 218 Ill. App. 3d 1087, 579 N.E.2d 398.

While at first blush this would seem to be a reasonably easy principle to apply, it has become apparent that there is often a fine line between those circumstances that are independent of the fire and

those that are not. Consequently, the proposition is best illustrated by the cases interpreting it.

In *Hedberg*, cited above, the reviewing court reversed the dismissal of plaintiff's complaint, finding that the plaintiff, a policeman, stated a cause of action when he alleged that while responding to a call about a prowler on the premises he was injured when he tripped on a depressed and defective portion of the sidewalk leading to the premises. The court found that a cause of action had been stated because the complaint alleged that the officer was injured by a cause independent of the emergency he was investigating.

So, too, was the recent decision in the case *Harris v. Chicago Housing Authority* (1992), 235 Ill. App. 3d 276. In *Harris*, firemen responding to a fire alarm hooked up their fire hoses to standpipes located within the burning building but found that there was no water pressure because the standpipes did not function. Without water to douse the fire, there was a buildup of heat and gases which precipitated an explosion and the plaintiff/fireman was injured as a result of that explosion. The trial court, relying on the fireman's rule, dismissed the complaint but the dismissal was reversed on appeal. Noting that it would still be necessary to prove causation and damages, the reviewing court held that a cause of action had been stated and that to hold otherwise would invite flagrant violation of public safety ordinances.

However, it was held that no cause of action was stated in *Coglianese v. Mark Twain Ltd. Partnership* (1988), 171 Ill. App. 3d 1, 524 N.E.2d 1031, or *Luetje v. Corsini* (1984), 126 Ill. App. 3d 74, 466 N.E.2d 1304. In *Coglianese* the reviewing court affirmed the dismissal of the complaint wherein the plaintiff, a firefighter, alleged that he was overcome by smoke, soot and noxious gases emitted by the burning building's interior walls which were constructed with materials which were not fire retardant and, consequently, failed to meet city codes. Dismissal of the complaint was also affirmed in *Luetje*, where the plaintiff firefighter was injured when part of the chimney fell from the burning building because of the fire. In both cases the courts found that the injuries suffered were not caused by circumstances independent of the fire, but rather were part of the risk normally associated with the firefighting profession.

In two other cases, *Horn v. Urban Investment & Development Co.* (1988), 166 Ill. App. 3d 62, 519 N.E.2d 489, and *Briones v. Mobil Oil Corp.* (1986), 150 Ill. App. 3d 41, 501 N.E.2d 821, summary judgment was granted in favor of the defendants. In each of these cases a firefighter was injured due to a fall. In *Horn* the fireman slipped on a

wet floor while inspecting the sprinkler system to determine the cause for a leak which had triggered the fire alarm. In *Briones*, firefighters responded to an alarm at a building that was being demolished. The owner informed the firefighters that holes had been cut in the floors because of the demolition. Nevertheless, one firefighter, while inspecting the fire scene, fell into a hole in the floor. On appeal summary judgment was affirmed in both *Horn* and *Briones*. The reviewing courts found that a landowner's liability should not extend to those situations where the injury-causing hazard is open and obvious or where the firefighters had been warned of the hazard, as in *Briones*.

Keeping in mind the basic premise of the fireman's rule and the cases which have interpreted and applied it, we now turn to the facts of the present case to determine whether the fireman's rule should have precluded recovery for plaintiffs.

In the present case, at about 7:40 p.m. on September 22, 1981, Engine Company 1 was notified over the firehouse public address system that there was a fire alarm at 8 South Michigan Avenue. Battalion Chief Higgins, along with an engine unit and a hook and ladder unit, responded to the alarm. Within minutes they arrived at the building, which was a 38-floor high-rise. Higgins and the hook and ladder personnel were directed to a freight elevator, which was manned by a maintenance person, and taken to the 23rd floor, the top floor serviced by that elevator. From there the firefighters proceeded to walk to the 25th floor, where the fire was reportedly located. At the 25th floor they encountered a locked stairwell door and were unable to access that floor. Since there was also no sign of fire at this location, the firefighters proceeded up to the 26th floor, where the stairwell door was not locked. Upon entering the 26th floor, Higgins noticed heavy smoke and a "glow" indicating the presence of fire. A hose was then hooked up to a standpipe located in the stairwell on the 25th floor and the firefighters attempted to attack the source of the fire. After directing water at the glow, the smoke diminished and Higgins was able to determine that the fire was in the shaft of elevator 8. Shortly thereafter Higgins heard a "whooshing sound" and realized that elevator 8 had dropped.

In the meantime, more firefighters appeared on the scene responding to the alarm. Lieutenant Matthew Thomas of Engine Company 42 and his personnel, Kestler, McShane and Outlaw, along with Hitz and Cathcart of Truck Company 1, entered the lobby of the building at 8 South Michigan. Thomas noticed a man standing just inside an elevator, holding it at the ground-floor level through the use of a key. As Thomas and the other firefighters approached this eleva-

tor (later identified as elevator 7), the man turned the key, taking it off manual and placing it on automatic. Although Thomas attempted to speak with the man, the man appeared to not understand, spoke in a foreign language and "ran off." The six firefighters then entered elevator 7 and proceeded up to the 24th floor, one floor below the floor where the fire had been reported.

The elevator operated without any apparent difficulty and the firemen exited elevator 7 at the 24th floor. One man stayed behind, however, to hold the elevator at that floor since they did not have the key. The remaining firemen walked up to the 25th floor, where they encountered other firemen attempting to break down the locked stairwell door on that floor. Since there was no sign of fire at this location, the firefighters did not persist in their efforts to break down the door but, instead, decided to take other action. The firemen who had been attempting to force the door open proceeded up to the 26th floor, while Lieutenant Thomas and the men with him returned to the elevator to reach the 25th floor by that avenue.

The six firefighters, each possessing breathing apparatus and other equipment, reentered elevator 7 at the 24th floor. The button for the 25th floor was pushed and the elevator began to move. After that, however, the elevator did not operate properly. It lurched to a stop and the elevator doors would not open. The elevator remained stuck regardless of the buttons that were pressed by the firemen.

While the firemen attempted to get the elevator to operate or the doors to open, it was discovered that the emergency phone in the elevator did not work and the alarm bell did not ring. Shortly thereafter the lights in the elevator went out and smoke began to fill the elevator. The firemen put on their breathing apparatus and continued to attempt to escape the elevator. They used their equipment to try to break through the elevator access hatch at the top of the elevator, but found that it was securely fastened from outside the elevator and could not be forced open.

All at once and for no apparent reason, the doors to the elevator opened and the firemen were hit with a blast of intense heat and smoke. The smoke was so thick that visibility was reduced to a couple of inches at best. The men exited the elevator trying to locate a means of escape from the heat and smoke. By this time their airpacks were nearly empty and the men were being forced to breathe the hot, smoky air. As the men groped their way through the smoke-filled floor, two men fell down the open elevator shaft of elevator 8, which was located directly across the hall from elevator 7. The other four firemen were able to find their way to safety despite the fact that

their route was obstructed by a glass partition and door which was locked shut. McShane and Hitz, who fell down the elevator shaft, died from the fall. Outlaw and Cathcart were injured as they sought safety after escaping elevator 7.

In their third-amended complaint plaintiffs alleged that they were injured as a proximate result of defects in the elevator and defects on the 25th floor which were unrelated to the fire. Specifically, plaintiffs contended that defendants were negligent (1) by maintaining the building so that the usual emergency and escape routes from the elevator lobby of the 25th floor were blocked by a glass partition, (2) by allowing the stairwell doors on the 25th floor to be locked, (3) by failing to repair elevators 7 and 8 when it was known that they were malfunctioning, (4) by bolting the access hatch of elevator 7, (5) by failing to provide a working telephone and/or alarm bell in elevator 7, (6) by failing to provide or maintain electrically illuminated signs to indicate the location of exits, stairwells, and fire escapes, and (7) by failing to warn of these latent and hidden defects.

After all the evidence was presented, a jury returned a general verdict in plaintiffs' favor, reduced by 50%, due to plaintiffs' own contributory negligence. Now on appeal defendants contend that they were not negligent because no duty was owed to the plaintiffs pursuant to the fireman's rule. They concede that the fireman's rule would not shield them from liability for injuries or deaths which resulted from conduct or conditions present at the fire scene which created undue risks of injury " 'beyond those inevitably involved in firefighting.' " (Defendants' brief at p. 23, quoting *Erickson v. Toledo, Peoria & Western R.R.* (1974), 21 Ill. App. 3d 546, 315 N.E.2d 912.) They argue, however, that the allegedly negligent conditions asserted by plaintiffs in this case were not outside the realm of risks normally encountered by firefighters. Additionally, they argue that plaintiffs did not show (1) the existence of any hidden, unusual or unexpectedly dangerous conditions, (2) that defendants were aware of or should have been aware of any dangerous conditions, or (3) that the allegedly dangerous conditions proximately caused plaintiffs' injuries. Finally, defendants argue that any possible negligence on their part was negated by the negligence of the plaintiffs' conduct.

Thus, the issue for this court to determine on appeal is whether there was sufficient evidence presented at trial to show that circumstances existed at the fire scene which were independent of the fire and which caused or contributed to the deaths and injuries suffered by plaintiffs and their decedents.

THE ELEVATORS

■ The elevators are a major issue in this case, and both plaintiffs and defendants raise several points concerning elevators and their use by firefighters. First, it is defendants' contention that plaintiffs failed to show that any elevator-related defects asserted by plaintiffs were independent of the fire. Therefore, they contend that any injuries related to the use of the elevator are "related to the fire" for the purposes of applying the fireman's rule. Secondly, defendants argue that plaintiffs should not be allowed to recover because it was plaintiffs' own negligence in taking the elevator to the reported fire floor, in contravention of their own rules and regulations, which proximately caused their injuries and superseded any defects alleged by plaintiffs.

Initially, we note that the fireman's rule has never been applied in Illinois in the context of a high-rise building and we are aware of only one Maryland case, *Flowers v. Rock Creek Terrace Ltd. Partnership* (1987), 308 Md. 432, 520 A.2d 361, where the fireman's rule was applied in this context. The high-rise situation is somewhat unique because elevators must be utilized by firemen to reach the fire scene with their equipment despite the fact that elevators are inherently dangerous during a fire and ordinary citizens are usually directed to refrain from using elevators during a fire. Consequently, an elevator is a place where a firefighter might reasonably be expected to be while fighting a fire in a high-rise.

Nevertheless, a firefighter-plaintiff has a major hurdle to overcome when trying to impose liability upon a landowner/occupier for injuries related to his use of an elevator at a fire scene. First of all, in order to avoid the preclusive effects of the fireman's rule, he must prove that any alleged defects in the elevator were unrelated to the fire. Even if a firefighter is injured because an elevator does not operate correctly, if the elevator's failure to operate correctly is shown to be caused by the fire, then the fireman's rule applies. This is because an elevator's failure to operate correctly during a fire is one of the risks inevitably faced by a firefighter in a high-rise situation. Such was the decision in *Flowers*.

In *Flowers* the plaintiff-firefighter (Flowers) fell down an open elevator shaft from the lobby of the 12th floor as he was directing tenants being evacuated from the burning building. Flowers was unaware of the open shaft because it was obscured by smoke. Flowers alleged, among other things, that he was not warned of the open elevator shaft and that the elevator had malfunctioned because it was

not sufficiently fireproof and, therefore, was defective. The trial court held, and the Maryland Court of Appeals agreed, that Flowers was injured in the course of firefighting and that an open elevator shaft was not a hidden danger of which firemen must be warned. Rather, an elevator malfunction which caused the doors to remain open, and thereby exposed an open shaft, was deemed within the range of risks typically faced by firefighters. Therefore, the Maryland court concluded that the fireman's rule precluded recovery.

In the present case plaintiffs presented evidence at trial in support of their allegations that their injuries were proximately caused by certain defects in elevator 7. Specifically, plaintiffs attempted to show that elevator 7 did not stop level with the floor and its doors failed to operate properly, that the alarm systems within the elevator did not conform with city codes and that the escape hatch was improperly fastened. Plaintiffs also attempted to show that these defects were unrelated to the fire. It is the sufficiency of this evidence that we must now consider.

With regard to the first point, there is no question that elevator 7 failed to operate properly. Several of the firemen testified about the way the elevator jerked to a stop, how it failed to stop level with the 25th floor and how the doors failed to open. The problem is whether plaintiffs presented sufficient evidence from which one could conclude that these malfunctions were not fire-related.

In support of their proposition that the malfunctions of elevator 7 were not fire-related, plaintiffs relied upon the testimony of one witness who claimed that *elevator 8* had malfunctioned earlier in the day and that the buildings' maintenance staff had been notified of the elevator's performance. This witness indicated that the doors of elevator 8 had "bounced" and had not stopped level with the floor. Plaintiffs then postulated that because elevator 7 and elevator 8 shared the same machine room, evidence that elevator 8 exhibited problems prior to the fire was some evidence that both of the tower elevators (7 and 8) were malfunctioning prior to the fire so that a jury could have concluded that the problems experienced by the firefighters in elevator 7 during the fire were unrelated to the fire.

This evidence, which itself was rather speculative, was contradicted by a wealth of evidence that elevator 7's doors malfunctioned due to an interruption of the electrical service to the elevator caused by the smoke, soot and high heat generated by the fire. For one thing, elevator 7 operated properly when the firefighters took it up to the 24th floor and it was only when it was used to go up to the 25th floor, where the fire was located in the shaft of elevator 8, only a few

feet away from elevator 7, that it malfunctioned. In addition there was evidence that the elevator functioned properly after the fire. Therefore, we would have to agree that there was no real evidence that a preexisting condition caused elevator 7 to malfunction. We must conclude that plaintiffs' evidence on this point, standing alone, would have been insufficient to have sustained the jury verdict in plaintiffs' favor.

However, this was not the only evidence of negligence related to the elevators relied upon by plaintiffs. Plaintiffs also presented evidence that, once trapped in the elevator, they were thwarted in their efforts to escape or be rescued by (a) the inoperative alarm systems and (b) the tightly secured access hatch on top of the elevator.

At trial plaintiffs showed that although elevator 7 appeared to contain two means of emergency communication, *i.e.*, an alarm bell and an emergency telephone, it was actually equipped with only one, an alarm bell, which failed to operate. The phone had been disconnected in 1979 so that it could not possibly have provided a means of communicating with the elevator and this was certainly unrelated to the fire. Plaintiffs contended that defendants were negligent for failing to provide two means of communication and in support of this argument showed that 1970 ANSI standards so required.

Defendants countered by arguing that the applicable Chicago Municipal Code required only one means of communication and that, because the elevator contained an alarm bell which had worked properly prior to the fire, the elevator conformed with the applicable code. Defendants further argued that if the alarm bell failed to operate (and there was conflicting evidence on this point), it was due to the fire and, therefore, outside the scope of their liability under the fireman's rule.

In rebuttal to this plaintiffs contended that the alarm bell was an indicator of defendants' negligence even if the alarm bell failed to operate because the fire had inactivated the electrical circuitry to the elevator. It was plaintiffs' position that it was customary and more appropriate for the alarm bell to be on a separate circuit from the electrical circuit that operates the elevator. This, however, was apparently not done in this case.

While we agree that there was sufficient evidence that the alarm bell did not work, the pivotal point is, once again, whether there was sufficient evidence that the malfunction was not fire-related. We believe that there is little question that, if the alarm bell did not work, the bell's malfunction was due to the interruption of electrical service to the elevator. Therefore, the failure of the alarm bell was, in fact,

fire-related. The fact that plaintiffs presented evidence that it was customary and, of course, wiser to wire the alarm system so that it was on a separate circuit does not alter the result since there was no evidence that an alarm bell would have functioned if it had been independently wired. The fire apparently would have interrupted all electrical service running to the elevator.

Nevertheless, we believe that plaintiffs were entitled to argue that, although defendants were not required to provide two means of communication, their failure to provide a second emergency signaling device, coupled with the fact that the alarm bell was wired into the elevator's circuitry, was evidence of defendants' negligence, which made the building unreasonably unsafe.

The next alleged defect involves the access hatch on the top of elevator 7. Plaintiffs presented evidence that after elevator 7 malfunctioned and came to a halt, the firemen attempted to escape through the hatch on the top of the elevator, using their pike poles to try to force the hatch open. The hatch did not open and, for this reason, plaintiffs conclude that it was not properly fastened.

The parties agree that the intended use of the access hatch is for emergency personnel to access the elevator *from the outside*. Consequently, city codes required that the access cover be so attached that it could be opened *only from the top of the car without a tool*. Plaintiffs attempted to show that elevator 7 did not comply with this provision of the code through their expert's testimony. However, a review of the testimony of their expert (Hurley) shows that he only testified that the bolt on the top of the elevator "appeared snug" and "possibly" would require a tool. The expert admitted that he never attempted to actually move the bolt on the top of the elevator. Therefore, plaintiffs failed to meet their burden of establishing a code violation with respect to the elevator access hatch.

Furthermore, even if there had been proof of a code violation with regard to the access hatch, there would still be the issue of proximate cause. It is not clear to this court how the fact that the access hatch was tightly secured caused plaintiffs' injuries. Plaintiffs merely speculate that, had the hatch been opened by the firemen, they would have safely escaped or been rescued. There was no evidence presented to support the notion that the firemen could have reached safety via the hatch and, in fact, no rescue operation was hampered due to the condition of the bolt on the access hatch. Therefore, plaintiffs failed to show how the condition of the hatch, even if defective, proximately caused the injuries. (See *Coglianese v. Mark Twain Ltd. Partnership*, 171 Ill. App. 3d at 6.) Without this necessary link, we

would be unable to impose liability upon the defendants based upon this alleged defect.

## THE BUILDING

■ Apart from the elevator, there were other conditions of the premises at 8 South Michigan Avenue which, plaintiffs argued, were indicative of defendants' negligence and which proximately caused or contributed to the plaintiffs' injuries. First, plaintiffs argued that the locked stairwell door on the 25th floor was a safety hazard and that because the door was locked the firefighters were forced to seek other means of investigating the fire. Therefore, the locked stairwell door put all of the subsequent events into motion, thereby causing the injuries to occur.

Second, plaintiffs attributed negligence to the physical configuration of the 25th floor. Specifically, plaintiffs argued that because a locked glass door and partition separated the lobby from the stairwell door there was no means of egress from the lobby (except the elevator) and that this situation was unsafe as well as a violation of city codes. Furthermore, because of the configuration of the 25th-floor lobby, the firefighters who had been trapped in the elevator essentially became trapped again in the 25th-floor lobby and were forced to break the glass partition in order to escape.

Third, plaintiffs complained that the elevator lobby was devoid of any emergency signage to indicate the location of exits or stairwells. Because of this omission, which was shown to be another violation of city codes, the firefighters were given no direction to follow upon exiting the elevator.

Plaintiffs argued that, due to the lack of signage, the firefighters expended precious time and were forced to breathe in hot gases and smoke as well as remain in the extreme heat generated by the fire for a longer period of time while they aimlessly searched for an exit.

According to certain physical evidence presented at trial, it appeared that McShane and Hitz turned right upon leaving elevator 7, where they encountered locked steel doors of a machine room, which made up one side of the lobby. As they proceeded along in their search for an exit, they came upon elevator 8, where they fell down the open shaft. The remaining firefighters apparently exited the elevator and turned left, where they were blocked by the locked glass door and partition.

After reviewing the record and considering all of the arguments on these issues, this court has concluded that these conditions did indeed make the building unreasonably unsafe and that the cited defects

form a proper basis for finding the defendants negligent. There is no question that the above-cited conditions of the premises were not caused by the fire and, therefore, are not fire-related so as to be dismissed under the fireman's rule. Therefore, we believe that it was for the jury to determine whether the self-contained lobby and the lack of signage were evidence of defendants' negligence which caused, contributed to or exacerbated the injuries suffered by plaintiffs and their decedents. The jury having determined that defendants were negligent, we find no reason to overrule their judgment. Furthermore, as stated in *Harris v. Chicago Housing Authority* (1992), 235 Ill. App. 3d 276, to ignore city code violations which were adopted to promote public safety would encourage their continued violation.

## CONTRIBUTORY NEGLIGENCE OF THE FIREMEN

Defendants argue that any negligence attributable to them should be negated by the overriding or superceding negligence of the firemen in taking elevator 7 to the 25th floor.

As stated earlier, firefighters must utilize elevators to reach the fire scene in high-rise situations. Consequently, if a firefighter is injured and his injury is related to his use of an elevator, the mere fact that an elevator was used should not be indicative of the firefighter's negligence and should not preclude recovery.

■ Nevertheless, it is obvious, even to a lay person, that elevators, being electrically operated, mechanical conveyances, carry certain inherent risks, especially in fire situations. Furthermore, as defendants so aptly presented at trial, a cardinal rule of firemen, taught to them during their training and reinforced through department rules and regulations, is "never to take an elevator to the fire floor." For this reason we believe that when applying the fireman's rule in a situation where a firefighter is injured in conjunction with the use of an elevator in a high-rise situation, it is appropriate to consider whether the firefighter's use of the elevator was proper under the circumstances.

Certainly, if a fireman's use of an elevator is deemed the sole cause of his injury, no recovery would be available. If, however, the use of the elevator, although deemed improper, is not found to be the sole cause of the injury, then it may be used to limit the recovery that might be due because of defendants' negligence. Such was the case here.

In the present case the jury apparently found that the firefighters' own negligence in utilizing the elevator under the attendant circumstances made them contributorily negligent and, accordingly,

the jury reduced plaintiffs' recovery by 50%. Derendants would like this court to overrule the jury and find that the firemen's use of the elevator was the sole cause of their injury. We cannot agree.

Proximate cause is a fact question for the jury to resolve. There can be more than one proximate cause of an injury, and in such cases, each party may be held responsible for his own negligent conduct, whether it contributed in whole or in part to the injury, as long as it was one of the proximate causes. (See *Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 492 N.E.2d 1364.) Additionally, the comparison of the parties' negligence and the allocation of chargeability is another matter peculiarly within the province of the jury which should not be disturbed unless it is against the manifest weight of the evidence. (*Junker v. Ziegler* (1986), 113 Ill. 2d 332, 498 N.E.2d 1135.) We see no reason to upset the jury's apportionment of liability between the parties in this case.

We now consider the remaining issues presented by the defendants, *i.e.*, whether the trial court erred in instructing the jury or in making certain evidentiary rulings and whether any errors, if found, warrant the granting of a new trial.

OTHER ISSUES

Defendants contend that the trial court erred in allowing the jury to be instructed on Chicago Municipal Code sections relating to signs, access to egress, elevator access openings and locked doors even though there was insufficient evidence to prove that the codes had been violated or that the purported violations proximately caused the plaintiffs' injuries. We find no error by the trial court.

■ A party is entitled to instruction upon each theory of the case for which some evidence has been presented. (*Galowich v. Beech Aircraft Corp.* (1991), 209 Ill. App. 3d 128, 568 N.E.2d 46.) In this case the plaintiffs did produce some evidence that the stated code violations occurred and, as stated earlier, whether the violations were a proximate cause of the injuries was a question to be resolved by the jury. If the trial court had instructed the jury as defendants suggested, informing the jury that firemen assume all risks associated with firefighting, the court would have been expanding the fireman's rule beyond its normal parameters in contravention with our Illinois Supreme Court's pronouncements in *Court v. Grzelinski.*

■ The defendants next argue that the trial court abused its discretion when it barred the testimony of David Schuman, an expert who was tendered by defendants as a rebuttal witness, as a sanction under Rule 220 of the Illinois Supreme Court rules (134 Ill. 2d R. 220)

for their failure to timely disclose this witness. First, it appears that defendants have waived this issue due to the fact that they failed to include this issue in their post-trial motion and their notice of appeal.

Furthermore, a trial court is imbued with broad discretion when it decides to exclude an expert's testimony as a sanction and the decision will not be interfered with unless it appears that the trial court abused that discretion. (*Appelgren v. Walsh* (1985), 136 Ill. App. 3d 700, 483 N.E.2d 686.) Here the trial court ordered that Schuman's deposition be taken and then ruled that his proffered testimony would have been duplicative of the testimony given by defendants' other expert, Hazard. Since defendants have not disclosed what testimony of Schuman's was pertinent to their position, we are unable to determine what prejudice, if any, defendants have suffered as a result of the trial court's ruling. Therefore, we find no basis for finding that the trial court abused its discretion and the ruling need not be reversed.

■ Defendants next complain that the trial court erred in certain evidentiary rulings, *i.e.*, permitting plaintiffs' expert, McGinley, to testify to opinions not disclosed in discovery and permitting McGinley to testify to inapplicable standards.

The testimony that defendants find offensive is McGinley's opinion testimony that the absence of directional signs violated the Chicago Municipal Code. First of all, we note that, once again, defendants fail to state exactly how they were prejudiced by the allegedly improper testimony of McGinley. Secondly, the ordinance itself was submitted to the jury. In light of these facts, we believe that any error in the court's exercise of its discretion in allowing McGinley to testify would be harmless error. (See *Gale v. Hoekstra* (1978), 59 Ill. App. 3d 400, 375 N.E.2d 456.) In any event, our review of the evidence convinces us that the trial court properly ruled that McGinley's testimony was within the subject matter of his opinions already disclosed during discovery.

■ Defendants' next point is that McGinley's testimony concerning the 1971 American National Standards Institute (ANSI) standards in relation to elevators was improper because the tower elevators were renovated in 1967 or 1968, at a time when the 1960 ANSI standards were applicable. Again we must disagree. In *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93, the court held that it was proper to allow testimony on regulations even though they were inapplicable because they were adopted at a later date. This was because the regulations were used, not to prove a violation, but as evidence of general negligence and disregard for public safety. We find

the same rationale applies in the present case. McGinley was able to express the opinion that the failure to make certain improvements, although not a violation of existing codes, was indicative of defendants' negligent disregard for the safety of the public.

Furthermore, the jury was well advised that the 1960 ANSI standards, and not the 1971 ANSI standards, were applicable to the elevators. Therefore, any possible error in allowing the testimony concerning 1971 ANSI standards was harmless at best.

■ In their next issue, defendants argue that the trial court improperly excluded expert testimony which allegedly would have explained how an exhibit photograph was misleading. Defendants contended that, because of the angle that the photograph was taken, the exhibit failed to show a fire exit sign over the stairwell door. The trial court concluded, however, that the expert was unnecessary.

As stated earlier, the trial court has broad discretion when deciding whether to permit or exclude expert testimony. An expert need testify only- if he has some special knowledge that will aid the jury in its understanding of the evidence. (*Binge v. J.J. Borders Construction Co.* (1981), 95 Ill. App. 3d 238, 419 N.E.2d 1237.) We do not feel that the trial court erred in excluding the proffered expert testimony since defendants were free to argue that the angle of the photograph eliminated the sign and we agree that jurors would not need any specialized assistance in understanding such an argument.

■ Lastly, defendants argue that it was error for the trial court to have allowed the jury to hear testimony concerning the origin of the fire. They contend that this evidence improperly suggested that defendants were liable for the fire.

It is true that, according to the fireman's rule, defendants are not liable for any negligence pertaining to the manner in which the fire occurred. In this case, however, one witness testified briefly that he first learned of the fire when he observed some trash burning on elevator 8 after he pressed the elevator button and elevator 8 arrived on the 25th floor. This evidence merely formed the foundation or background for his other testimony. It was not presented to show the defendants' negligence. We believe that any error that might be associated with the admission of this evidence was harmless in light of all of the other evidence and because defendants have not demonstrated that they were prejudiced in any way by its admission.

■ As a final argument defendants contend that they are entitled to a new trial based upon the accumulation of the errors, as outlined above. As we already indicated, none of the alleged errors were prejudicial to the defendants. Neither is their cumulative effect. Par-

ties are entitled to a fair trial, not a perfect one. Technical errors or misrulings which are not found to be prejudicial provide no basis for upsetting a jury's verdict. (*Roberts v. Sisters of Saint Francis Health Services, Inc.* (1990), 198 Ill. App. 3d 891, 556 N.E.2d 662.) We believe that the parties received a fair trial, ably presided over by a conscientious judge, resulting in a jury verdict which was not favorable to either party. We see nothing to suggest that a new trial would change the result.

For all of the reasons stated above, we affirm the judgment and verdict rendered in the trial court.

Affirmed.

McNULTY, P.J., and LORENZ, J., concur.