SURRENDRA PATEL, Plaintiff-Appellant and Cross-Appellee, v. BROWN MACHINE COMPANY, Defendant-Appellee and Cross-Appellant.

First District (6th Division)    Nos. 1—92—2102, 1—92—2116 cons.

Opinion filed June 17, 1994.

Cooney & Conway, of Chicago (James T. Newman, of counsel), for appellant.

Galliani, Doell & Cozzi, Ltd., of Chicago (Thomas J. Doell, of counsel), for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

While repairing a trim press the plaintiff's fingers were severed when the press was turned on accidentally. The plaintiff, Surrendra Patel, filed a product liability action based on strict liability and negligence against the manufacturer of the trim press, Brown Machine Company (Brown). Brown filed a third-party action against the plaintiff's employer (Concord), but settled with the employer for the amount of the worker's compensation lien. The trial judge granted Brown's motion for summary judgment on the strict liability count, and the case went to trial on the negligence count. A jury returned a verdict in favor of the plaintiff and assessed damages in the amount of $2,020,000, but found him 84.6% contributorily negligent. His damages were thus reduced to the sum of $311,080.

Both parties have appealed, and the appeals have been consolidated. The plaintiff contends that the jury verdict that he was contributorily negligent was against the manifest weight of the evidence and that the judge erred in permitting proof of negligence on the part of the plaintiff's employer. Brown contends that the jury finding of negligence on the part of Brown was against the manifest weight of the evidence, that the action should have been barred by the statute of limitations, and that the judge erred in permitting certain evidence and instructing the jury on the plaintiff's future lost income.

The press involved in this case was identified as a TP-10E trim press and was used for cutting plastic lids. The allegations of negligence were that Brown (1) failed to provide adequate guarding "to keep the plaintiff's hand from being caught on the trim press"; (2) failed to provide "proper operating instructions on the machine"; (3) failed to provide "proper means with which to align material in the trim press"; (4) failed to provide "adequate warnings as to the unrea-

sonable dangerous condition of the trim press"; and (5) failed to design proper controls so as to avoid accidental "energization."

Patel worked at Concord Industries, Inc., in Franklin Park from 1972 to 1980 and from 1984 to 1986. On September 4, 1985, Patel worked for Concord Industries as a "set-up" man. His job entailed changing the molds and dies on the thermoforming lines and presses and then adjusting the machine if necessary so that the line would run efficiently. On September 4, Patel changed the dies on the thermoforming line to set up a new job. To "set up" the line, all guards are removed and an overhead crane lifts the old dies out and replaces them with new dies. Then, the dies are bolted in and the set-up man reaches in through the product outlet holes to line up the plastic sheets. Patel was having difficulty obtaining an accurate cut from the trim press, the part of the line that cuts the containers from the plastic sheet. The process began with a roll of plastic, 28 to 32 inches wide (weighing between 1,000 and 1,800 pounds). The roll was placed on an unwind stand so that a continuous sheet could be fed through the thermoformer. The sheet moved horizontally through the thermoformer over its electric heaters and into a mold area, where platens (moving up and down) used vacuum and air pressure to form the pieces in the plastic sheet. The sheet then passed through the trim press. The sheet travelled downward into the trim press, which consisted of a platen with dies that moved horizontally against a fixed die platen, cutting out the rows of pieces that were formed on the plastic sheet. The cut-out pieces came out of holes in the front of the press onto a work table (for packing) while the scrap came out of the bottom of the press.

During the morning of September 4, Patel found out that the "disconnect switch" on the back of the machine did not work. The power disconnect switch was located on an orange control panel (referred to as the "set-up" switch) on the right side of the machine. On the front of the press, a start-stop button was located on the right side and an emergency stop button on the left side; between the two buttons were exit chutes where the plastic lids were discharged. The electrical energy came from an outlet on the ceiling.

Patel testified that he customarily turned off the power disconnect switch when he adjusted the plastic or set up the machine. He was supposed to turn off the power on all types of machines before he worked on them. Between 9 and 10 a.m., he told his supervisor, Don Clark, that the power disconnect switch was not working. Clark told him, "[I]'ll take care of it. Right now [I] don't have any parts." Patel continued to try to realign the plastic for the trim press but the press continued to cut the pieces improperly. After returning from lunch,

Clark looked at the machine on which Patel was working. Patel showed Clark where the press was cutting the plastic sheets improperly. Clark then tried to line up the sheet through the locator. To do this, Clark put his hands in the machine. Clark tried to move the steel bars and hammers and then tried to cut a couple of pieces. He tried to cut the pieces three or four times but it still did not cut properly. Patel then described what took place:

> "Then, I tried to explain to him that there is nothing wrong in setting up. There is something wrong in the plastics or middle of the die or the plastic laying two, three days. *** I said I will hold one like to one like that. One doesn't line up exactly in the die, not going to get the particular thing. *** [Clark] told me one or two times, 'Move this—move this one.'
>
> Q. *** What was your position?
> A. Kneeling down.
> Q. What were you doing with your left hand?
> A. With the left I was holding the plastic still on the one locator with the other hand tried to move the plastic showing him [Clark] by turning my hand around the die. I show it doesn't line up.
> Q. So where was your right hand?
> A. On the last opening.
> Q. Mr. Clark was standing behind you to your right?
> A. Right shoulder.
> Q. Was he kneeling also? Was he standing up?
> A. He, bending like that.
> Q. What, if anything, happened next?
> A. Next, I got my hand cut off. I lose my fingers.
> Q. Did you see whether or not Mr. Clark pressed the button?
> A. No, I didn't see that.
> Q. But is there any other way the machine could have started?
> A. No, only one start button in front panel."

On cross-examination, Patel testified that he took the guards off the machine before he began the setup. Patel never had seen a trim press where one did not need to remove the guards before putting a new die in or a press that could be set up with new dies without reaching into it. He admitted that blocking, *i.e.*, putting wooden blocks in the machine so that it would not run a cycle, would have been a better procedure but that, if he inserted the blocks, he could not move the platen to line up the plastic sheet. He admitted that he could have manually moved the platen with a flywheel mechanism; however, he preferred not to use the flywheel because the timing movement on the platen was not synchronized. He customarily turned off the disconnect switch before he put his hands into the machine; he could not turn it off on September 4, 1985, because the

switch was broken, *i.e.*, the switch and handle were turning, but the mechanism was broken.

Patel stated that, although he could have pulled the plug in the ceiling outlet, "It's hard to reach the plug." He stated that he was not allowed to do it, but the electricians are allowed to remove the 440 volt plug. When asked whether he could have unplugged it or at least asked Bobby, the electrician, to do it, he replied, "Yes." He added that he did not think there was any possible way that the machine could have started aside from Clark pushing the start-stop button on the right side of the machine.

On recross, he was asked whether he was supposed to shut off the power on all the machines before working on them and he responded, "Yes." Patel admitted that he could have asked the electrician to fix the switch instead of climbing up to the ceiling to unplug the press. When he adjusted the plastic in the exit chutes with his hand, he did not use the flywheel mechanism to rotate the platen because it was too heavy. Instead, he ran tests on the machine with the guards off. He ignored the warning on the machine that stated, "Do Not Operate with the Guards Off" because, he explained, that warning was provided for the operators, not for the set-up person.

The evidence deposition of Louis Harkrader, a former mechanic and sales representative for Brown, was introduced. Harkrader examined various photos of presses (the TP-10E and the TP-22) and stated that, when the TP-10E left Brown in 1970, the start-stop buttons were connected to the machine. Based on the photos he was shown, the only differences between the photos and the TP-10E, when manufactured in 1970, were that the start-stop buttons were not connected to the machine and that a discharge table was added. (It is unclear which photos he was shown because all of these photos have not been included in the record; moreover, he referred to photos from his evidence deposition and the photos introduced at trial were identified with different numbers.)

Patel called Bernard Downing, who was a quality assurance manager, engineering inspector, and product integrity engineer for Brown. He visited Concord in 1984 and inspected its thermoformers and trim presses. He determined that Concord needed "guards, interlocks, safety blocks, lock pins, and safety tags" on its trim presses (TP-10E). Specifically, he determined that the press needed side, front and rear guards. The press needed a tunnel guard above the discharge tube and over the exit chutes. He stated that Brown added an interlocked tunnel guard in the late 1970's. He recommended left and right side guards which would be hinged with electrical interlocks to stop the machine when the guards were

opened. He also recommended safety blocks, but failed to put it in his memorandum to Concord. Downing saw the machine that caused Patel's injury, a TP-10E, serial number 4314. He formed an opinion that one or more of the devices that he recommended in 1984 would have prevented Patel's injury: a lock pin, a safety block, or a main electrical disconnect.

On examination by Brown, he stated that when the TP-10E left Brown, it was fully guarded on the sides, front and rear; however, it had no tunnel guard at the exit chutes. The condition of the equipment at Concord was "very, very poor." In order to move the flywheel by hand and the platens, the set-up man cannot use blocks or a flywheel pin; they would not permit the flywheel or platen to move. To ensure safety, the set-up man should shut off the power at the main electric disconnect and lock the switch.

Daniel Pacheco was Patel's expert. He worked 17 years at Allis Chalmers; the last position he held there was chief engineer for systems design. His design experience included various aspects of engineering, safety design and guarding. At the time of trial, he was president of Polytechnic, a mechanical engineering firm for accident investigation work focusing on the safety and design aspects of products. To investigate this accident, he visited Concord in July 1986 and viewed a machine similar to the one involved (a TP-22). One of his associate engineers from Polytechnic, Doug Morita, visited Concord in 1989 and viewed the exact machine that was involved, a TP-10E. Pacheco reviewed drawings, engineering specifications, design documents and photos of the machine. He also reviewed the depositions of Pat Hosel, Concord's personnel manager, and Don Clark, Patel's supervisor, and OSHA inspection records on the plant. He also viewed photographs of the TP-10E on which Patel was injured; photographs of this press were taken weeks after the accident by William Wildman, a Brown employee. Wildman's photos indicated that neither the TP-22 nor the TP-10E had guards at the point of operation. The photos taken in 1989 indicated that the press had been altered; it was equipped with a guard that was interlocked; when the guard was removed the machine would not operate.

In Pacheco's opinion the TP-10E was not adequately guarded when sold in 1970 based on four reasons: First, "there were no guards on the machine in the hazardous area where these components come together *** you want that guard to be interlocked with the machine so that if the guard is taken off or swung aside there is a switch *** that will not allow the machine to operate." This would protect the set-up man because when he opened the machine, the interlock would automatically cut the power so the machine could not start inadvert-

ently. Pacheco explained an interlock as "the same idea as a refrigerator door, when you open the door the light comes on. That's an interlock. It is a switch that opens and turns the lights on when you open the door. In this case when you swing the guard away the switch would operate to prevent the machine from starting." If a set-up man wanted to run a test piece, he would have to close the guard and then run the piece through it. He testified that interlock guards were feasible in 1970 because similar trim presses manufactured in that year were in fact equipped with interlocking guards.

Second, he opined that safety blocks should have been available to prevent the platens and dies from moving when a set-up man was inside the machine. Third, he testified that the press' start-stop buttons should have been ring-guarded or designed as pull-out buttons. Fourth, he recommended that the set-up man should have been provided tools so that he could hold pieces in position inside the machine without having to manually reach into the press.

Pacheco also testified that the machine should have had warnings or instructions printed on the machine: "It should have had instructions to utilize whatever safety devices that were provided in the design of the machine, should have advised of the hazardous areas and what kind of operations you could create a hazard with, and it should tell the person that's going to use the machine how to avoid those hazards." The only warning on the press was "Do not operate without guards in place."

Pacheco criticized the power-disconnect switch on the press. He stated that Brown should have anticipated that the disconnect switch could have been inadvertently turned on or could have been broken. He also stated that the plug's location was not an alternative safety device because of its ceiling location. Finally, he testified that a machine was not considered safe in 1970 or thereafter if it had only one safety device on it that was known to break with some regularity.

On cross-examination, he admitted that he had no experience in the plastics industry. He did not read Patel's deposition before he gave his discovery deposition. He did not personally inspect the TP-10E, but he took 14 photos of the TP-22. He never saw a trim press before 1986 and did not see one in person since his visit to Concord. When he took photographs at Concord, he believed that the accident occurred on the 42P-HD thermoformer, but later learned that it was not involved. He acknowledged that the TP-10E was built with bolt-on guards. He originally stated that Patel was injured when he put his hands through the side of the machine, not at the exit chutes. He later stated that Patel was reaching "basically from below and up" and that Patel "intended to put his hands in" the exit chutes. He

agreed that the machine was equipped later with a tunnel guard and that a set-up man must remove it to work on the machine.

In regard to the interlock recommendation, he stated that there were standards "that address the need to interlock guards which would come into play when a set-up man *** would have the guard out of position." He was not aware of any standards that suggested that a worker doing setup should rely only on the interlock mechanism. He acknowledged that if a set-up man relied on the interlock mechanism and it became jammed due to a mechanical switch, then he could be severely injured if he had not cut the power. He was not aware of any mechanism that could not be circumvented; he admitted that it is "sometimes" done by set-up men who wish to run the machine with the guards off. However, if the main power is "locked-out," then the interlock cannot be circumvented; if the main power were disconnected, there would be no way the machine could be operated regardless of which safety devices were circumvented. He admitted that it is "common in the industry" for set-up men to be instructed to shut off the main power and then lock the switch in the "off" position. He did not observe any padlocks on the switches at Concord.

In regard to the safety blocks, he admitted that the machine could not be manually cycled if the blocks were in place. He also stated that the set-up man "conceivably" could get his hands caught in the press when he placed the blocks in the cutting area or in the slides (that move the dies).

He admitted that the press did not store power and that the press would not move unless the motor was receiving power. He had never set up a trim press nor had he ever seen one set up. He did not know if any trim press in 1992 could be set up from outside the machine. He stated that tools have been invented for positioning parts in presses, but he did not know why they were not used today for set up.

In regard to the ring guard, he stated that there was a ring around the start switch but it was not a "guard"; the outer ring merely held the switch in the control box. He stated that a pull-out start button would avoid inadvertent operation of the machine. A pull-out start button was available; he was not sure if any standards specifically addressed the use of it. He acknowledged that he saw photos of the start buttons at Concord on which the operators hung their purses. He conceded that "perhaps" a pull-out start button could be started inadvertently if an operator pulled on the button when she removed her purse. An inadvertent start, however, could be avoided if the main power were disconnected.

He did not know how long it would have taken to change the power disconnect switch on the morning of the accident. He stated that if the set-up man unplugged the press at the ceiling, then each time he wanted to test the machine, he would have to plug in the machine.

In regard to the literature that he relied on to support his opinions, he stated that the American National Standards Institute (ANSI) Safety Requirements for 1976 did *not* apply to a trim press, but that they did apply to other presses such as a power press and to other types of plastics machines. He acknowledged that the TP-10E did have bolted-on side guards, as required by ANSI 2.4; that ANSI 1.3.2 stated that all upgrades to the machine, which were supposed to be implemented by 1979, were the responsibility of the employer; that ANSI 3.1.2 and 3.1.3 also made the employer responsible for staff training and inspection of the machine; that, if the top guards were fixed, as in the TP-10E, then there was no need for interlocked guards, according to ANSI 4.3.3; and that ANSI 6.1 stated, "The employer shall train and instruct the personnel and provide adequate supervision to ensure that safe procedures are followed." He recognized that the 1982 ANSI standard 2.3 stated that the emergency stop button should be mushroom-shaped; it did not require that the button be a pull-out type. No other standards ever required a pull-out type stop or start button.

The 1973 Plastic Industries Safety Handbook (Handbook) stated that the emergency buttons should be located at the operator's station. The emergency buttons on the TP-10E were located there. The TP-10E's emergency button is supposed to disconnect the main power, in accordance with the Handbook. The Handbook did not refer to any pull-out buttons. The Handbook also stated that "Safety guards may disappear or be removed when the machine is transferred from one owner to the other so proper safeguards must be reinstalled before machine goes into service." He acknowledged that it would be the employer's responsibility to inspect or update the machine, but that the employer would have to know what safety features were originally designed for the press. The Handbook stated that the "stop button should protrude and be lightly tensioned"; it did not refer to any pull-out mechanism. He would not admit that the start button on the TP-10E was ring-guarded. He agreed with the Handbook's recommendation that all machine repair and maintenance persons always should pull the switch and lock it before making repairs, alterations or adjustments and, that workers should be encouraged to report all unsafe practices or conditions to their supervisors.

He conceded that nowhere in any of the literature upon which he

relied was there any recommendation or requirement that fixed guards be interlocked. Moreover, the literature did not state that the press could somehow be set up from the outside or that pull-out buttons should be used. He had no criticism of Brown's choice of the main disconnect component. If the power disconnect switch had been shut off, he testified that Patel's accident "could probably not" have occurred. Moreover, if the plug had been pulled until the switch was fixed, then the accident "would not have occurred."

On redirect, Pacheco testified that the press is only safe if it has a number of safety devices that will protect a person who has to put his hands into the point of operation; he stated, "You need more than one [safety device]. You need redundancy." He characterized the safety standards to which he referred as "voluntary standards *** . They are available to be followed by the industry." He doubted that anyone could cut pieces of plastic by manually moving the platens and dies with the flywheel mechanism. He repeated that interlocking hinged guards at the point of operation were well known in the industry in 1970 and that a ring guard costs about $1.

On recross, he admitted that the safety literature clearly distinguished between fixed and interlocked guards because fixed guards cannot be opened inadvertently.

Brown first called Clare Wayne Taylor, Brown's shop operations manager. He worked for Lyle Development, a competitor of Brown, from 1961 to 1982 and was vice-president when he left. He started at Brown in 1984 and worked as an engineering supervisor, quality assurance manager and then shop operations manager. He rebuilt and operated TP-10E's from as early as 1964.

As built, the TP-10E had bolt-on guards on the left and right sides and on the rear of the machine; on the front was a discharge tray. The main disconnect was located on the right side of the machine. About 99% of all disconnect switches used by Brown were made by General Electric; they are available today from any electrical distributor. The disconnect switch can be padlocked; custom and practice in the industry, as well as current OSHA standards, require the main power to be cut on all machinery before working on it. This has been a standard of practice for as long as Taylor "could remember."

As built, the TP-10E had Cutler-Hammer controls with a ring-guarded stop button. The pictures of Concord's TP-10E showed that the start button was not the original; it was a replacement button. He thought the original button was black, not green. When Taylor referred to a "ring guard" he meant a button that was encased in a metal shield on the outside and the button was flush with the shield.

No one in the industry used a pull-out stop button in 1970. A pull-out stop button cannot serve as a substitute for a power disconnect switch.

According to the standards of the Occupational Safety and Health Administration (see 29 U.S.C. § 655 (1988)), a fixed guard is the best guard because it is more permanent and, to penetrate the area tools are needed to remove the bolted-on guard. Taylor stated that an interlock can be bypassed and it should not be used as a safety feature. He defined it as "nothing more than a convenience item *** like an extra stop button." An interlock is never a replacement for the main power disconnect switch. Even if an interlock is used, the main power disconnect must be in the "off" position if someone chooses to go inside the machine. Interlocks also can fail on their own or become jammed.

Taylor testified that the TP-10E could be turned by hand with the flywheel. He stated that no one should test run the press without the guards in place. There was a warning on the TP-10E; it stated that it should not be operated with the guards off. Set-up men are not to operate the press with the guards off. (At Brown, if a set-up man operates the press without guards, he is suspended for three days and if repeated, he is fired.) The TP-10E cannot be set up from outside the machine. In 1992, no trim press could be set up from the outside. At the time of trial, Brown was attempting to redesign the front platen and die so that it was one piece; but a set-up man would still have to shut down the machine and make the changes.

Taylor did not know how the TP-10E involved in this case came into Concord's possession. He believed that Container Corporation originally purchased the press from Brown. Concord never requested Brown to train its personnel or set up the press. He only knew that Downing performed a safety audit at Concord in 1984. After the follow-up, Concord did not pursue any of the safety recommendations because it lacked the money to do so.

He testified that it was not necessary to use blocks when setting up the press because they would need to be three different sizes and would probably fall out when manually turning the dies. Instead of blocks, he insisted that the main power be cut.

On cross-examination, he admitted that Brown did not put a tunnel guard over the exit chutes when the TP-10E was manufactured. In 1970, 42 companies made trim presses and thermoformers, not only three as he had stated during his deposition. He admitted that no standards for guarding had been adopted by the plastics industry.

William Keefe, a consulting engineer and vice-president for Haz-

ard Engineering, testified as Brown's retained expert. For the plastics industry, he investigated machine designs of plastic injection molding machines, blow molding machines, granulating machines, grinders, extrusion machines and trim presses. This case involved the first Brown trim press he had investigated. On March 17, 1989, he inspected three TP-10E's at Concord; two were operating and one was idle.

A comparison of the photos taken in 1985 and Keefe's photos taken in 1989 indicated a considerable alteration: a whole new set of fixed guards had been installed on the rear, sides and front of the press. As built, the TP-10E had bolted-on guards on the sides and rear of the press; there were no guards in the area above the exit chutes. Keefe saw no need for any guards above the three exit chutes because a discharge table prevented operators from reaching into the machine. He understood that Patel's accident occurred when he reached into the left and right exit chutes; for some unknown reason, the press stroked and Patel's right hand was injured.

He criticized Patel for reaching into the machine with the main power on because it is "well-known throughout the industry that before you perform maintenance work *** or set up or adjust components inside *** where there are hazards present, you have to disconnect the power and lock it in the off position." If the main power is off and it is locked, then there should be no problem. The ram of the press is horizontally sliding so there is no danger of gravity pulling the ram down and pinching your hand; there is no stored energy like hydraulic or pneumatic pressure. He thought the accident happened because Clark inadvertently actuated the start button on the press.

A tunnel guard generally prevents operators from reaching into the exit chutes; however, anyone still can reach through the guards and into the chutes. As with all of the guards on the press, the tunnel guard also must be removed when setting up the press. Shutting off the power and locking out the main power is the standard procedure. Keefe suggested that if the main power switch appeared broken, one should open the cabinet and turn the switch with pliers or one should unplug the machine. Also, there should have been another disconnect switch in the plant. ANSI standards require cutting and locking out power before working on all machines and employers must establish and enforce that policy.

According to the Accident Prevention Manual for Industrial Operations (Chapter Eight; "Principles of Guarding") from the National Safety Council, the fixed guard is the best type of guard because it does not have any electrical components that can fail. An

interlocked guard must be maintained "constantly" and inspected; it could fail. Based on the National Safety Council's standards, Keefe's opinion was that a maintenance or set-up man should not depend on a safety lock, as opposed to shutting off the main power.

Keefe opined that the TP-10E as designed and built had no defects: "The machine was provided with fixed guards \*\*\* [and with] controls that were very effective in the operation of the machine." He also opined that the warnings and instructions provided with the press were adequate: "The concept that you have to disconnect power on a machine like this before you do maintenance work is well known throughout the industry. It applies to every machine in a factory, so there is no \*\*\* special need on this machine to provide a special warning or \*\*\* instruction for users of this machine." After setting up a machine, the guards should be replaced before testing. In his opinion, the cause of the accident was Patel's failure to disconnect the power before working on the press, and to a lesser extent, Concord's failure to set and enforce an adequate lock-out policy.

Keefe stated that the press was not properly maintained at the time of this accident. Although any component on a machine is subject to wear and tear, the switch should have been inspected and maintained after 15 years. He personally investigated a dozen or two dozen accidents caused by failed, bypassed, or inadvertently operated interlocks. Nonreturn or pull-out stop buttons add no additional safety for a set-up man because they can become damaged or worn and can return automatically their release positions. Nonreturn stop buttons generally are used for printing presses that have multiple operator stations that are synchronized (*e.g.*, for inserts in a newspaper). At Concord, he remembered observing all sorts of objects (purses, tools, production schedules) hanging from the stop buttons. In particular, a purse hanging from a button could release it.

During cross-examination, he admitted that no fixed tunnel guard was in place over the exit chutes when the TP-10E was built, but it was later added. He conceded that the tunnel guard over the exit chutes should have been interlocked or bolted to the machine. He was then reminded of his deposition testimony when he stated that the tunnel guard should have been an "interlocked guard." He also stated in his deposition that the absence of an interior interlocked guard had nothing to do with the set-up operation. If an operator is required to open the press, then an interlock should be used; but for a set-up man reaching inside, the best protection is turning off the main power at the disconnect switch. Even though a set-up man must take guards off, he should not repower or start the press until the guards are replaced.

After closing arguments and instructions, the jury returned a verdict in favor of Patel for $2,020,000, itemized as follows:

| | |
|---|---:|
| Past Medical Expenses | $ 33,000 |
| Past Lost Wages | 133,000 |
| Future Lost Wages | 770,000 |
| Disability | 400,000 |
| Disfigurement | 400,000 |
| Past Pain and Suffering | 250,000 |
| Future Pain and Suffering | 34,000 |
| TOTAL | $2,020,000. |

The jury further found that 86.4% of Patel's own negligence contributed to his injury, reducing Patel's recoverable damages to $311,080.

We will first consider Patel's argument that Brown did not meet its burden of proof on the issue of Patel's contributory negligence and that the full verdict should not have been reduced.

The defendant in a comparative negligence case has the burden of persuading the trier of fact on the issue of plaintiff's negligence, because the defendant is the party who stands to benefit from such a showing. (*Casey v. Baseden* (1986), 111 Ill. 2d 341, 490 N.E.2d 4.) The question is whether Brown met its burden under a preponderance of the evidence standard of showing that Patel failed to exercise that degree of care that a reasonably prudent person would have used in the circumstances, and that failure was the proximate cause of his injury. (*Moran v. Aken* (1981), 93 Ill. App. 3d 774, 417 N.E.2d 846.) Brown argued that Patel was negligent in seven different ways: Patel failed to shut off the power to the press, to pull the plug on the machine, to warn his co-workers that the power was on and to stay away from the area, to remove his hands from a perilous area when he knew his co-worker was in the vicinity, to follow proper and customary procedures and Patel placed his hands into the machine when he knew the power was on. Patel urges us to reject each of those arguments as a matter of law. We must refuse to do so.

■ In India, Patel received a degree in chemistry and completed part of the requirements for a master's degree. In the United States he had attended an industrial engineering college and took tool-and-dye-making courses at Lane Tech in Chicago. He knew how to cut power to the machine even if the main power disconnect was broken. The jury was aware of Patel's extensive experience with this machine and the safety procedures that he customarily had taken. The jury could also have inferred that Patel was so knowledgeable about the machines that he might have taken a risk and attempted to fix the

press even though the power was still on. It would serve no purpose to discuss each separate argument advanced by Brown. It is enough to say that the jury could have inferred that Clark and Patel both knew that the main power disconnect was broken but they chose to work on the machine anyway. Patel also put his hands into the exit chutes without the guards in place. He clearly violated the express warning on the machines. It is obvious that Patel attempted to circumvent certain safety procedures in order to cut down his delay time. For these reasons, we conclude that the jury could properly find that Patel was contributorily negligent.

The plaintiff's next contention is that the defendant was improperly permitted to introduce evidence of the plaintiff's employer's negligence. The evidence of which the plaintiff complains was the testimony of Bernard Downing, a Brown engineer, and of Brown's expert, Keefe. During cross-examination, Downing was asked about the "general level of maintenance on the machine" when he saw it in March 1984 on Concord; he responded, "It's a marvel that the maint[enance] people could keep it running. *** I would say it was in very, very poor condition." Patel's attorney objected on the ground that the employer's negligence was irrelevant to the issues presented in the case; the objection was overruled.

Before Brown proceeded with its case, Patel's attorney moved "to bar any testimony or further testimony regarding conduct by plaintiff's employer, as any such conduct is not at issue in this case and is not a defense." Brown's attorney stated that the conduct of Patel and Concord was relevant if their conduct was the sole cause of the accident. He pointed out that Patel raised the issue of Concord's conduct in its case by bringing out the fact that the machine needed various safety features. He argued that Brown should be able to present evidence that Concord chose not to implement those features; without such testimony, Brown urged, it would appear that Brown did not follow up with its safety recommendations.

Brown's expert, William Keefe, testified that the accident was caused, in part, by Concord's failure to "institute and enforce an adequate lock-out policy at the plant." He also stated that the machine was not properly maintained.

The plaintiff relies on *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210, and *Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 385 N.E.2d 690. Both cases are strict liability cases, not negligence cases. In *Hammond* the supreme court rejected the manufacturer's claim that it was relieved of a duty to warn because it sold its product to "sophisticated purchasers" upon whom the manufacturer could rely "to give the necessary warnings" to

their employees and others. (*Hammond,* 97 Ill. 2d at 208.) In *Anderson* the supreme court held that in an action against a manufacturer of a forklift truck, conduct attributable to someone other than the plaintiff may be a defense only if the conduct constituted a misuse of the truck and that such misuse was not reasonably foreseeable to the manufacturer.

But Brown does not maintain that it was relieved of its duty to warn; it maintains that it did warn. The TP-10E had a warning on it: "Do not operate without guards in place," a warning which the plaintiff admitted he routinely ignored. Under *Anderson,* the defendant would be permitted to show a misuse of the product, which is what the defendant maintains the evidence showed.

■ In *Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309, another strict liability case, the court held that a defendant may introduce evidence to support his defense that the sole proximate cause of the plaintiff's injury was the conduct of the plaintiff's employer in failing to properly instruct the plaintiff. If such evidence is proper in a product liability case, where the contributory negligence of the plaintiff is not an issue, *a fortiori,* the evidence should be admitted where the contributory negligence of the plaintiff is an issue. In this case, the defendant maintained that the sole proximate cause of the injury of the plaintiff was the plaintiff's own negligence and the negligence of his employer. To support that claim, it properly offered evidence of the negligence of the employer.

We turn now to Brown's appeal. Brown first contends that the verdict in favor of the plaintiff was against the manifest weight of the evidence. In substance, Brown's claim is that the testimony of the plaintiff's expert, Pacheco, should be rejected as a matter of law.

In his second amended complaint, the plaintiff alleged that the defendant failed to provide the following: (1) adequate guarding "to keep the plaintiff's hand from being caught in the trim press"; (2) proper operating instructions on the machine; (3) proper means "with which to align material" in the trim press; (4) adequate warnings "as to the unreasonably dangerous condition of the trim press"; and (5) properly designed controls "so as to avoid accidental energization."

Pacheco testified that the defendant was negligent in its design and manufacture of the TP-10E in five respects: (1) there should have been interlocked guards on the sides, rear and front above the exit chutes where the press opens up for a set-up man; he said that other presses manufactured in 1970 had interlocked guards; (2) safety blocks should have been available to prevent the platens and dies from moving when a set-up man was inside the press; (3) the start/ stop buttons should have been ring-guarded or designed as pull-out

buttons; (4) tools should have been designed so that the set-up man could work on the press without having to manually reach into it; and (5) the press should have been labelled with instructions for the set-up man to use all safety devices that were provided with the press.

In this court, the defendant repeats all the arguments it made in the trial court, which were really attacks on the credibility of Pacheco. The defendant argues that his testimony should be given no weight because it was unsupported by experience or specialized knowledge. The record, however, indicates that Pacheco had a considerable amount of experience in design and safety engineering. He became a registered engineer in 1970 and graduated first in his class from engineering school. He worked for 17 years at Allis-Chalmers as an associate engineer; as an engineer in the test experimental department, design engineering section; as a senior design engineer; and finally, as chief engineer in charge of systems design. His experience included various aspects of engineering and safety design, including guarding. Although he had no experience in the plastics industry, he had extensive experience in machine and safety designing. Consequently, we must reject the defendant's attempts to discredit Pacheco's testimony by attacking his background.

We will not repeat all of the testimony of Pacheco or even all of the cross-examination of Pacheco, but we will address one part of his opinion to illustrate why we must reject the defendant's argument.

Pacheco gave the opinion that all of the guards (rear, sides, upper front and area above the exit chutes) should have been protected with interlocked guards that would have cut off the main power whenever a guard was opened by either a set-up man or an operator. He remained firm in his opinion that interlocked guards were feasible in 1970; significantly, he testified that other press manufacturers did utilize them. He was not asked to identify those companies by either counsel. During cross-examination, the defendant's counsel did not ask Pacheco which companies utilized an interlocked guard in 1970. (Forty-two manufacturers made presses in 1970.) Although no one asked Pacheco to list the other companies that used interlock guards in 1970, he stated unequivocally that "basically identical [to the TP-10E] trim presses were in fact equipped with interlock[ed] guards."

■ A witness may not guess or state an opinion which is based merely on speculation or conjecture. But the expert may give an opinion without disclosing the facts which underlie or support his opinion, and it is the burden of the opposing party to bring out those facts on cross-examination. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) The burden was on the defendant's counsel to probe

the basis for Pacheco's opinion concerning the feasibility of interlocked guards in 1970. The defendant now claims that Pacheco's opinion was not supported by industry practice. The defendant chose not to probe Pacheco's knowledge of which manufacturers utilized interlocks in 1970; instead, he focused on certain standards which were not applicable to this press. Significantly, neither of the defendant's witnesses unequivocally stated that an interlock could not have been added as an additional safety feature or that other manufacturers did not utilize the device in 1970. Consequently, it is our judgment that the defendant cannot now claim that Pacheco's opinion was "unsupported."

The weight to be assigned to each expert's opinion is for the jury to decide in light of the expert's credentials and the basis for his opinion. (*Johnson v. Amerco, Inc.* (1980), 87 Ill. App. 3d 827, 409 N.E.2d 299.) While the conclusions reached by the experts may have been conflicting, the jury was free to make credibility determinations and to accept or reject a party's theory and expert testimony. Viewing all the evidence in the light most favorable to the plaintiff, the evidence does not so overwhelmingly favor the defendant that no contrary verdict could stand.

The defendant next contends that the trial judge erred in denying the defendant's motion for summary judgment and post-trial motion based on the statute of limitations. This issue involves the rule which provides that a pleading amendment asserting a cause of action that grew out of the same transaction or occurrence set up in an original, timely pleading relates back to the date of the filing of that original pleading for purposes of limitations. Ill. Rev. Stat. 1991, ch. 110, par. 2—616(b).

The original complaint is not in the record. The first amended complaint, filed on June 1, 1987, identified the machine as a "142PHD Thermoformer." The first amended complaint also stated the following:

"13. At the time and place aforesaid, while operating said machine, the Plaintiff's hand was caught *in the press*, causing injuries to him.

14. At the time and place aforesaid, *the punch press* was unreasonably dangerous and defective in one or more of the following ways: ***." (Emphasis added.)

The statute of limitations ran on September 4, 1987, and the plaintiff filed his second amended complaint on April 7, 1989. In the second amended complaint the plaintiff did not identify the machine in question specifically but used the term "certain machinery (*i.e.*, thermoforming equipment) including a trim press."

The defendant's specific argument is that the statute of limitations ran because Patel failed to identify specifically "the TP-10E" as the machine involved on September 4, 1987, within two years of the accident. Patel's position is that the first amended complaint sufficiently referred to "a press" or "a punch press" so that the defendant knew to which machine the plaintiff referred. The defendant later introduced evidence to show that the thermoformer was not a punch press or a drill press and that a drill press was different from a punch press.

The issue was first presented to Judge Thomas Hoffman on the defendant's motion to dismiss the complaint. Judge Hoffman denied the defendant's section 2—615 motion (Ill. Rev. Stat. 1991, ch. 110, par. 2—615), which was based on the plaintiff's failure to identify the "aforesaid machinery" referred to in the complaint. The following colloquy occurred at the hearing:

"JUDGE HOFFMAN: Yes, the machinery we are talking about is thermoforming equipment, including a trim press.

DEFENDANT'S ATTORNEY: Your Honor, I want to know because now, almost, well, four years post-accident, we are going from the specific to the general, and what I want to know is does this allege that he was injured on a trim press?

JUDGE HOFFMAN: Sure it does. Because the Paragraph 2 defines what we are talking about—well, Paragraph 1 does, specifically, thermoforming equipment, including a trim press. And Paragraph 2 again talks about thermoforming equipment, including a trim press. And every other paragraph, 'said equipment,' 'said equipment,' 'said machinery,' 'said machinery.' It can only refer to one thing.

DEFENDANT'S ATTORNEY: That is where I have a problem, where it said 'aforesaid.' If he's saying he was hurt working on a trim press, I don't want a generality and a vagueness.

JUDGE HOFFMAN: I don't have a problem with that. I think he was hurt—I read it to be he was hurt on a trim press. If you want him to button it down, just give him an interrogatory."

The defendant later filed a motion for summary judgment on the ground that the statute of repose barred the strict liability claim and that the statute of limitations barred the negligence claim. Judge Aaron Jaffe, the trial judge in this case, granted the defendant's motion with respect to the strict liability claim, but he denied the motion with respect to the negligence count.

The defendant contends that it did not have notice, either through the complaint or discovery, that the accident occurred on a TP-10E within two years of the accident. During oral argument in this court, the defendant's attorney emphasized that there is no such

thing as a "punch press" in a thermoforming line. The plaintiff points out a crucial fact: the defendant knew that the accident occurred on a TP-10E a few weeks after the accident because two of defendant's employees, Bernard Downing and William Wildman, went to the Concord plant and photographed the exact TP-10E in which the plaintiff was injured.

Downing, previously employed by the defendant as its product liability claims manager, stated in his deposition that between September 4, 1985, and September 23, 1985, he personally inspected the TP-10E in which the plaintiff was injured.

Wildman, an employee of Brown, took numerous photographs of the TP-10E immediately after the accident occurred. These photos were admitted into evidence, and the defendant never disputed the fact that its own employee took these photographs of the exact TP-10E that was involved only weeks after the accident occurred. On January 16, 1990, apparently for the first time, the defendant stated in interrogatories that photographs of the TP-10E were in the possession of the defendant's attorney. In addition to the testimony of Downing and Wildman, the defendant's employees Harkrader and Clare Brown testified solely about the TP-10E. The opinions of Brown's expert, William Keefe, were addressed solely to the TP-10E. In light of these facts, the defendant cannot now complain that it did not know how "to defend the final pleading."

■ In our judgment, the defendant's defense is not really a statute of limitations defense, but rather a claim that the plaintiff's proof violates the rule that the proof must correspond to the pleadings. (*Cf. In re Jackson* (1993), 243 Ill. App. 3d 631, 611 N.E.2d 1356.) But a variance between the proof and pleadings is not deemed material unless it misleads the adverse party to his prejudice. (*Stevenson v. Meyer* (1957), 10 Ill. 2d 335, 139 N.E.2d 740.) Brown was never misled; it knew the exact machine that caused the plaintiff's injury, whether the plaintiff called it a thermoformer, a punch press, a drill press or a thingamabob. The trial judge properly rejected the defendant's affirmative defense that the second amended complaint was barred by the statute of limitations.

Brown's last contention is that the judge erred in admitting evidence of the plaintiff's future lost income and instructing the jury on future lost income. Brown maintains that there was no evidence to support a finding that the plaintiff was disabled.

Dr. Terry Light performed hand surgery on Patel. Patel's middle and ring fingers were too severely crushed to be reattached. However, the end portions of the index and little fingers were reattached. Dr. Light did not anticipate that the two fingers would have full motion.

So long as the fingers could be used as posts for the thumb to pinch against, Patel could try to grab objects. Patel did not regain any sensation in either finger. In Dr. Light's opinion, Patel's pain associated with cold-weather conditions was permanent.

Patel was not interested in voluntary reconstructive surgery for nerve grafting because he might lose sensation in his foot, and the chances for success were by no means guaranteed. With regard to work restrictions, Light said that Patel could not return to a job that required him to do primarily two-handed piece work or to be in an extremely hot or cold environment because he lacked sensation in those fingers. He was not sure how he restricted Patel after the operation, because he did not perform a work-capacity evaluation for him.

Patel testified that after spending 15 days in the hospital he was released but returned for physical therapy. Patel could not use his left hand because calcium deposits accumulated in it from the IV. He returned to Concord as a supervisor of production until August 1986, when he quit. *The supervisory job required him to place his hands in the machines.* The requirement that he place his hands in the machine caused him to get sick; he was "getting acid, vomiting, acidity, burning, vomiting" in his stomach. He took a couple of weeks off and then returned. He resumed the supervisor job but then became sick again. He then took off another couple of weeks. When he returned, Concord management asked him to return to his job as a "set-up" or "maintenance" man. He could not return to that job because it required the use of both hands.

He had not worked since his last return to Concord and had not tried to get back to work since that date. His salary at the time of the injury was approximately $50,000 a year. In argument to the jury, Patel's attorney said that the measure of damages for future lost earnings was the amount of money Patel was earning, less the amount of money he would be able to get for "some menial job" that he "assume[d] the plaintiff could find something where he can make $15,000 a year." He argued that the future lost wages should be calculated by subtracting the $15,000 from Patel's pre-injury income of $50,000 and multiplying the difference, $35,000, by the number of working years that remained, 22 years. The jury fixed the amount of future lost earnings at $770,000, thus reflecting acceptance of the plaintiff's attorney's argument.

Brown's attorney did not argue that the plaintiff's proposed damages were too high. Rather, he argued that the plaintiff should get nothing for future lost earnings:

> "I don't think there is any support whatever for lost time beyond his return to work. We haven't heard any testimony from

any rehabilitation people that he can't work or he is trying rehabilitation. He is a college graduate, he is only one year away from a master's degree. There are many things he could do if he chooses to do them. There is no reason for him to consider himself disabled and we have not heard from any doctors saying he is disabled. We haven't seen any job search. *We have had just testimony.* We haven't heard any evidence that there is no reason the man can't work and make good money because what he has up here is more valuable than what he could do with his fingers." (Emphasis added.)

On review, the question is whether there was sufficient evidence for the jury to award future lost income that was "reasonably certain to occur" in the future. (*Christou v. Arlington Park-Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, 260, 432 N.E.2d 920.) In *Christou*, the plaintiff introduced evidence of what an "average restaurant owner" would earn weekly and what a bartender "would have been making" at the time of trial; the plaintiff, however, had only an ambition to become a restaurant owner and his estimation of a bartender's earnings was based on his conversations with bartenders he knew. This court deemed this type of evidence "inadmissible speculation." (*Christou*, 104 Ill. App. 3d at 260.) Brown claims that the evidence in this case amounted to the same type of "speculation."

■ Generally, the measure of damages for impairment of earning capacity is the difference between the amount which the plaintiff was capable of earning before his injury and that which he is capable of earning after the injury. (*Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 449 N.E.2d 250.) Brown insists that there should have been some testimony from a rehabilitation expert about what job opportunities were and were not available to Patel. Such testimony, however, is not the only possible method by which a loss of earnings may be shown. A plaintiff may testify that his injuries diminished his capacity to work, and the general rule is that the appearance of the plaintiff on the witness stand, his testimony as to the nature of his injuries and their duration are sufficient to take the question of impaired earning capacity to the jury. *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 484 N.E.2d 542; *Bunch v. Rose* (1973), 10 Ill. App. 3d 198, 293 N.E.2d 8.

Patel did not argue that he could not work at any job or that he was entitled to an annual salary of $50,000 for the next 22 years. Instead, he conceded that he was employable at some wage, either twice the minimum wage or some wage below that amount. The defendant saw fit to make a "nothing at all" argument. We judge that the jury could make conclusions about the nature of Patel's perma-

nent disability and the capacity he had for other jobs in the future based on the testimony of the defendant and Dr. Light.

Brown claims that the testimony of Dr. Light showed that Patel was not restricted in any of his duties. Dr. Light's testimony, however, showed that Patel was limited in the use of his right hand. He testified:

> "I would probably have limited his heavy lifting kinds of activities because of his limitation of grasp strength in that hand. I might have suggested that his dexterity and his speed would be limited so that if he was to return to a situation where he had to do two-handed piecework, he would not be likely to succeed because of the lack of sensation in that hand. He would need to be very careful using that hand in that either working in a hot situation where it might be burned or some situation where he might injure it. He certainly would be unsuited for working in a cold environment such as meat packing or something of that sort."

The fact finder could have inferred from Dr. Light's testimony that Patel was no longer able to do the work that he was doing before he was injured.

Brown's argument here is that Patel is "obviously not totally disabled." That statement, however, ignores the focus of the inquiry on whether there was a sufficient basis from the evidence for the jury to calculate future lost income. It is clear that Patel's disability precluded him from working at a job that required the use of both hands or full dexterity in both hands. He could not return as a set-up man, the only experience he had had for 15 years; it was the only job in which he had received extensive training; he was 43 years old at the time of trial. The jury saw Patel's physical appearance and observed his minimal ability to speak English. Although Patel has a bachelor's degree in organic chemistry, the degree was awarded nearly 20 years ago in India. Based on the testimony of Patel and Dr. Light, the jury could conclude that Patel's skills were severely limited and that he could be employed in some position from the minimum wage to twice that amount. Based on that evidence, the jurors could draw on their own experience and infer which jobs Patel could handle with his permanent impairment. For these reasons, we judge that the jury verdict for $770,000 for future lost earnings was not against the manifest weight of the evidence.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and GIANNIS, JJ., concur.