ALEKSANDER ANTOL, Plaintiff-Appellee, v. LIBORIO CHAVEZ-PEREDA, Defendant (Chicago Transit Authority, Defendant-Appellant).

First District (5th Division)    No. 1—95—0959

Opinion filed October 11, 1996.

562

Norman J. Barry, Alvan S. Madans, and Kevin J. Moore, all of Rothschild, Barry & Myers, of Chicago, for appellant.

Philip H. Corboy, Francis Patrick Murphy, Shawn S. Kasserman, and David A. Novoselsky, all of Corboy & Demetrio, P.C., of Chicago, for appellee.

JUSTICE HOURIHANE delivered the opinion of the court:

Following a jury trial, plaintiff, Aleksander Antol (Antol), was awarded $4.5 million for personal injuries he sustained as the result of an accident involving his motorcycle and a station wagon driven by defendant Liborio Chavez-Pereda (Chavez). The vehicles collided after Chavez ran a red light. Plaintiff also sued the Chicago Transit Authority (CTA) on a negligence theory, alleging that one of its drivers waved plaintiff through the intersection without first determining that it was safe to proceed, and that the bus driver created a hazardous condition by positioning his bus partially in the intersection, thus obstructing plaintiff's view of the cross-traffic. The jury allocated liability 60% to the CTA and 40% to Chavez. The CTA appeals from the judgment entered on the jury verdict and the order denying its post-trial motion. 155 Ill. 2d R. 303.

On appeal, the CTA asserts that no duty to use ordinary care was created when the bus driver waved the plaintiff through the intersection; that the jury's allocation of fault is against the manifest weight of the evidence; that the trial court erred in giving the missing-witness instruction for the CTA's failure to produce the bus driver at trial; that the jury's verdict was excessive and erroneous; and that accrual of interest on the judgment should be stayed for the period in which preparation of the record on appeal was delayed due to the actions of plaintiff.

For the reasons that follow, we affirm in part, reverse in part, and remand this matter to the trial court for a determination of the relative liability of the defendants.

## BACKGROUND

Just past midnight, on June 16, 1988, plaintiff was driving his motorcycle southwest on Archer Avenue in Chicago. Riding on the back of the motorcycle was a co-worker. They were both on their way home from work. As plaintiff approached the intersection of Archer and Halsted, plaintiff noticed a CTA bus headed north on Halsted. The bus was stopped at the bus stop, with part of the bus extending into the intersection. Although the light was green for plaintiff, he slowed down as he approached the intersection because he was not sure if the bus was going to proceed. He was also concerned about other northbound traffic.

About 30 yards from the intersection, the bus driver motioned to plaintiff to proceed. Plaintiff hesitated and slowed down to about 10 miles per hour. Twice more the bus driver waved him on. As soon as plaintiff accelerated and moved into the intersection, he was struck by Chavez' vehicle. Chavez testified that the light had changed to green before he entered the intersection. Chavez could not see the bus driver from his vantage point and his testimony as to the location of the bus was inconsistent, stating at one point that the bus extended into Archer, but later testifying that the bus was stopped past the crosswalk but before the intersection.

A taxi driver, Andrew Chutzik, who was working that night and was travelling southwest on Archer behind plaintiff, observed the collision. He testified that he first saw plaintiff approximately 10 blocks before the collision site and that plaintiff was travelling between 25 and 35 miles per hour. The posted speed limit was 35 miles per hour. He further testified that about one-half of the bus was extended into the intersection.

The taxi driver saw plaintiff slow down as he approached the intersection and also observed the bus driver motion with his hand

for plaintiff to proceed. The bus driver was looking north as he motioned to plaintiff. Plaintiff was struck as soon as he entered the intersection. The taxi driver did not see the Chavez station wagon before the collision.

Also witnessing the collision was another motorist, James Bullock, who was travelling south on Halsted. Bullock testified that, at the time of the collision, the light for northbound and southbound Halsted traffic was red. He did not see a CTA bus, but did observe a station wagon heading north on Halsted at about 40 miles per hour. He first noticed it because of its speed. He heard the sound of plaintiff's motorcycle, looked to the left, saw plaintiff travelling at about 30 miles per hour with a green light, and realized there would be a collision. Bullock had been stopped at the red light for approximately 10 seconds prior to the collision. Bullock later told police that Chavez had gone through a red light.

Bullock's passenger did not see the events leading up to impact, nor did she see a CTA bus at the intersection prior to the collision. The only bus she saw was going south on Halsted and did not arrive until after the accident occurred.

Plaintiff did not mention the bus to anyone immediately after the accident and the CTA denied that one of its buses was at the scene. When the police arrived, there was no CTA bus at the intersection and only two vehicles were indicated in the accident report. Police issued three citations to Chavez. None were issued to plaintiff.

As a result of the accident, plaintiff sustained multiple contusions, a fracture near his left shoulder, and compound fractures to his left leg, necessitating amputation of his leg below the knee.

On December 9, 1988, plaintiff filed suit against Chavez and the CTA. Plaintiff alleged the CTA was negligent in directing plaintiff into the intersection before determining that it was safe and creating a hazardous condition by positioning the bus partially in the intersection. A jury awarded plaintiff $4,492,710, allocating 60% of the fault to the CTA and 40% to Chavez. The CTA's post-trial motion was denied and the CTA appeals.

## ANALYSIS

### I

The CTA first argues that in Illinois no duty to use ordinary care is created when a driver signals or waves someone through an intersection. Even if a correct statement of the law[1] , the CTA never asserted the absence of a duty in its answer or affirmative defenses,

---

[1]See *Diaz v. Krob*, 264 Ill. App. 3d 97, 636 N.E.2d 1234 (1994) (no duty

or in any other pretrial motion. Rather, the CTA defended the case on the basis that (i) no CTA bus was at the intersection at the time of the accident, and (ii) the plaintiff was negligent. In its motion for a directed verdict, the CTA argued only that even if one of its buses was at the intersection, there was no evidence that the CTA was "responsible" for the accident. This argument appears to address proximate cause, not duty. Additionally, the CTA's only objection to the jury instruction tendered by plaintiff, which set forth the law concerning the liability that may arise when one performs a voluntary undertaking without using ordinary care, was that it was "one-sided." The CTA never objected on the basis that it did not accurately set forth the law relative to any duty the CTA might have or that it was inapplicable in this case.[2] It was not until the CTA filed its post-trial motion for judgment notwithstanding the verdict or a new trial that the CTA first raised the issue of duty, arguing that there was no evidence that the CTA had a duty to plaintiff and that no duty arose as a matter of law.

■ ■ It is well settled that issues raised for the first time on appeal will not be considered. *Eagan v. Chicago Transit Authority*, 158 Ill. 2d 527, 534 (1994). It is also the rule that a party may not raise on appeal defenses not interposed in its answer before the trial court, and issues raised for the first time in a post-trial motion will not be considered. *Washington v. Civil Service Comm'n*, 120 Ill. App. 3d 822, 828, 458 N.E.2d 952 (1984). The CTA argues that the issue of duty, being a question of law, cannot be waived. However, the cases on which it relies, *Kus v. Sherman Hospital*, 268 Ill. App. 3d 771, 644 N.E.2d 1214 (1995), and *Bates & Rogers Construction Corp. v. North Shore Sanitary District*, 92 Ill. App. 3d 90, 414 N.E.2d 1274 (1981), are readily distinguishable. In *Kus*, the trial court left to the jury the task of deciding whether defendant owed a duty to plaintiff and so instructed the jury. Although the plaintiff did not object to the jury instruction, this court determined that the propriety of the jury instruction was not waived on appeal. We reasoned that "[p]ermitting a jury to assume a judicial role in determining whether a duty

---

arose where bus driver waved adult pedestrian, with no obvious impairments, through intersection). But *cf. Luna v. Pizzas by Marchelloni*, 279 Ill. App. 3d 402, 664 N.E.2d 1112 (1996) (defendant motorist under no affirmative duty to signal plaintiff that it was safe to make a left turn, but having voluntarily undertaken to signal, defendant became obligated to do so with care and may be held liable for injuries proximately caused by the lack of care).

[2]During the jury instruction conference, a discussion was held off the record, and for reasons not subsequently specified by the trial court, plaintiff's instruction on gratuitous undertakings was refused.

existed, especially where we determine that a duty did exist as a matter of law, deprives the plaintiff of a fair trial." *Kus*, 268 Ill. App. 3d at 782. In the case *sub judice*, the determination of whether a duty exists was not left to the jury. Thus, *Kus* is inapplicable to the facts present here.

In *Bates & Rogers Construction Co.*, on review of the grant of a motion to dismiss, we concluded that particular defenses to the existence of a duty not specifically urged in the trial court were not waived on appeal where they related purely to questions of law that were inherent in the finding of the trial court that no duty was owed. *Bates & Rogers*, 92 Ill. App. 3d at 97. Here, the CTA never challenged plaintiff's theory of the case that the CTA "took upon itself the duty to use ordinary care" when its driver waved plaintiff through the intersection. Thus, unlike the defendant in *Bates*, the CTA accepted plaintiff's assumption of duty theory.

Further, our supreme court has held that where a defendant municipality tried and lost a negligence case contending only that the facts present could not establish a special duty owed by defendant to plaintiff, defendant could not, on appeal, challenge the circuit court's judgment on a wholly different basis, attacking the very existence of the duty on constitutional grounds. *Leone v. City of Chicago*, 156 Ill. 2d 33, 38 (1993). Here, the CTA tried and lost the case on the theory that no bus was in the intersection and that plaintiff was negligent. The CTA cannot, on appeal, challenge the trial court's judgment on the wholly different theory that no duty exists as a matter of law. See also *Diaz v. Chicago Transit Authority*, 174 Ill. App. 3d 396, 528 N.E.2d 398 (1988) (CTA's failure to object to jury instruction on highest degree of care resulted in waiver of duty issue on appeal). Thus, we conclude that, for purposes of this appeal, the CTA has waived the issue of duty.

## II

We next consider whether the trial court erred in giving the missing-witness instruction in connection with the CTA's failure to produce the bus drivers who were scheduled to be travelling northbound on Halsted during the time of the accident. See Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1989) (hereinafter IPI Civil 3d).

■ Where a missing-witness instruction is inappropriately given or counsel is allowed to comment in argument on the failure to produce certain witnesses, if either acts to deprive the appellant of a fair trial, the grant of a new trial is warranted. *Simmons v. University of Chicago Hospitals & Clinics*, 247 Ill. App. 3d 177, 186, 617 N.E.2d 278

(1993), *aff'd*, 162 Ill. 2d 1 (1994). The decision to use the instruction or permit the argument is reserved to the sound discretion of the trial court. *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 22 (1989).

The inference that testimony of a witness within the party's power to produce would be adverse to that party is available when:

> "the missing witness was under the control of the party to be charged and could have been produced by reasonable diligence, the witness was not equally available to the party requesting that the inference be made, a reasonably prudent person would have produced the witness if the party believed that the testimony would be favorable, and no reasonable excuse for the failure to produce the witness is shown." *Schaffner*, 129 Ill. 2d at 22.

The instruction should not be given if the witness is equally available to either party or if the party provides a reasonable excuse for the failure to produce the witness. *Chiricosta v. Winthop-Breon*, 263 Ill. App. 3d 132, 157 (1994).

■ Based on these criteria, it cannot be said that the trial court abused its discretion by allowing the jury to be instructed as to missing witnesses. Preliminarily, we note that the CTA defended this case on the basis that no bus was at the intersection at the time of the accident. However, the parties stipulated that, according to the CTA's own operations planning schedules in effect on June 15 and 16, 1988, buses were scheduled to proceed northbound on Halsted through the Archer intersection at 11:50 p.m., midnight, 12:10 a.m., 12:16 a.m. and 12:20 a.m. These times correspond to the approximate time frame of the accident.

The drivers were certainly under the control of the CTA and presumably could have been produced with reasonable diligence. We note that pursuant to the Metropolitan Transit Authority Act (70 ILCS 3605/1 *et seq.* (West 1994)), any person who is about to commence a civil action against the CTA for personal injuries must file a notice within six months of the injury or the date the cause of action accrued with the CTA and its general counsel. 70 ILCS 3605/41 (West 1994). The purpose of this provision is to allow the CTA to make a timely investigation, locate witnesses, and generally be in a position to better defend itself against bogus claims. *Hinz v. Chicago Transit Authority*, 133 Ill. App. 2d 642, 645, 273 N.E.2d 427 (1971). Notice was properly given here, but the CTA offered no reasonable excuse for the failure to identify and produce the bus driver(s).

In response to the plaintiff's request to produce the names and addresses of the bus drivers and supervisors, the CTA stated that documents disclosing the identity of the supervisors had been

destroyed, but that the investigation into the identity of the bus drivers was continuing. The CTA never produced the names of the bus drivers. At trial, counsel for the CTA argued that records pertinent to the identity of the drivers had been destroyed:

"MR. KAPPLER [CTA counsel]: Well, it has been my position all along what I have been dealing with that it would be to our advantage to have that driver if we could identify one, and I have maintained all along since I have had the case and have repeatedly tried to get the names and have not been able to get them.

THE COURT: Why?

MR. KAPPLER: Because the information given to me is that these were destroyed. If there is no significance and they thought there was no driver involvement here, they don't keep the lists of scheduled drivers they do have, and I was not able to provide them."

According to Mr. Kappler, the records were destroyed within six months of the occurrence. It is difficult to reconcile the CTA's position that there was no driver involvement and therefore no need to keep records from the date of the accident, when the CTA's own schedule shows four buses travelling by the accident scene at the appropriate time. However, to the extent that this was the defense the CTA chose to pursue, it was reasonable to expect that the CTA would call the drivers who were scheduled to be travelling through the intersection at the approximate time of the accident to testify.

As to the balance of the criteria under *Schaffner*, the bus drivers were not equally available to plaintiff, the CTA having failed to ever identify them. Moreover, we note that a witness is not "equally available" to a party where, as here, there is a likelihood that the witness will be biased against the plaintiff by virtue of his or her employment with the defendant. *Simmons v. University of Chicago Hospitals & Clinics*, 162 Ill. 2d 1, 8 (1994). A reasonably prudent person would have called the bus drivers if their testimony supported the CTA's defense that no bus was at the intersection, and as indicated above, counsel for the CTA admitted that it would have been to the CTA's advantage to have the bus driver at trial. The CTA offered no reasonable excuse for not providing the witnesses, in light of its notice of plaintiff's claim.

On appeal, the CTA relies on plaintiff's failure to file a motion to compel with respect to plaintiff's request to produce the names of the bus drivers, and plaintiff's failure to include the drivers in its Rule 237 (134 Ill. 2d R. 237) notice for trial. In plaintiff's Rule 237 notice he included only a general reference to CTA supervisors, not drivers. However, the failure of a plaintiff to serve a Rule 237 notice upon a

defendant commanding the production of a witness who, by virtue of employment, is potentially biased against the plaintiff is not a reasonable excuse for the defendant's failure to call the witness. *Simmons*, 247 Ill. App. 3d at 187. Similarly, we cannot say that plaintiff's failure to file a motion to compel absolves the defendant from its failure to call important witnesses at trial. Under these facts, it was not an abuse of discretion for the trial court to give the missing-witness instruction.

### III

■ The CTA also asserts that the jury award of $4.5 million was "shockingly high." The award was apportioned as follows:

| | |
|---|---|
| Disability | $1,250,000 |
| Disfigurement | 625,000 |
| Pain & Suffering | 1,750,000 |
| Lost earnings | 636,720 |
| Medical | 230,990. |

The CTA first maintains that the verdict form improperly listed disability and disfigurement as separate line items, contrary to IPI Civil 3d No. B45.03.A, thus allowing plaintiff a double recovery. The CTA suggests a remittitur of $625,000. The record discloses that the CTA never objected to the verdict form on the basis that it did not comply with the IPI form and this argument is therefore waived. See *Robinson v. Greeley & Hansen*, 114 Ill. App. 3d 720, 724-25, 449 N.E.2d 250 (1983). Even if not waived, we disagree with the CTA that the plaintiff obtained a double recovery. "Disability" and "disfigurement" are not synonymous terms:

> "Physical 'Disability' is defined as '[a]bsence of competent physical, intellectual, or moral powers; *** incapacity caused by physical defect or infirmity.' [Citation.] The term 'disfigure' means 'to make less complete, perfect, or beautiful in appearance or character.' [Citation.]" *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 175 (1995).

See also *Mulack v. Hickory Hills Police Pension Board*, 252 Ill. App. 3d 1063, 1068, 625 N.E.2d 259 (1993) ("Disability" is "the inability to pursue an occupation or perform services for wages because of physical or mental impairment"); *Rapp v. Kennedy*, 101 Ill. App. 2d 82, 84, 242 N.E.2d 11 (1968) ("Disfigurement" is "that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner"). Thus, a plaintiff may be disabled, but not necessarily disfigured. The converse is true, as well.

Although the Illinois Pattern Jury Instruction applicable at the

time of trial in this matter listed the damages from disability and disfigurement as one line item, we observe that the Illinois Pattern Jury Instructions, Civil, lists the damages from disability and disfigurement as two separate items, either or both of which may be used where the evidence so justifies. See IPI Civil 3d No. 30.04, Notes on Use. Thus, the trend is to treat these damages separately. We cannot say that where, as here, the plaintiff's left leg was amputated below the knee, it was erroneous to seek damages for disability and disfigurement as separate components of the total damage award. Although the itemization of damages may create a risk of overcompensation where the elements overlap (see *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 935, 631 N.E.2d 1269 (1994)), in this case we are satisfied that the jury could determine damages for plaintiff's disability separate and distinct from plaintiff's disfigurement.

◼ As to the CTA's claim that the jury award, in the aggregate, "shocks the conscience," we disagree. The award of damages is generally left to the sound, intelligent judgment, or good sense, of the jury. *Tonarelli v. Gibbons*, 121 Ill. App. 3d 1042, 1050, 460 N.E.2d 464 (1984). A jury award should be reversed on appeal only if it is evident that the amount "resulted from passion or prejudice, and that the amount falls outside the limits of fair and reasonable compensation and shocks the judicial conscience." *Lundquist v. Nickels*, 238 Ill. App. 3d 410, 435, 605 N.E.2d 1373 (1993). A jury's award is not subject to remittitur where it falls within the flexible range of conclusions reasonably supported by the evidence. *Chambers v. Rush-Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d 458, 468, 508 N.E.2d 426 (1987).

Dr. Nillawan Yongsmith, plaintiff's post-amputation treating physician, testified that plaintiff walks with an abnormal gait and that, due to the loss of sensation in his left leg, he will never be stable on his feet. She also testified that as a result of his injuries, he may already be suffering the effects of premature arthritis. Additionally, further diagnostic testing will be required to determine whether there has been nerve damage to his right leg, and there exists the possibility that the condition of this leg will worsen. Finally, given the nature of plaintiff's injuries, he will require ongoing medical consultation and treatment.

Plaintiff and his wife testified as to the intense pain he experienced following the accident, the pain he continues to suffer in both legs, the difficulties navigating with a prosthesis, and the impact his injuries have had on his ability to maintain a normal life with his wife and children.

Given the severity and permanency of the plaintiff's injury to his

left leg, the ongoing pain, the loss of mobility, and the uncertainty of complications to his right leg, we believe that the jury award falls within the limits of fair and reasonable compensation. We note that a comparison of this verdict with other cases involving the loss of a limb will not determine the propriety of the jury award here, as each case must be considered on its own facts. *Pasquale v. Speed Products Engineering*, 252 Ill. App. 3d 724, 734-35, 624 N.E.2d 1277 (1993). The CTA has similarly failed to establish a credible basis on which this court may conclude that the jury award of $1.75 million for pain and suffering is excessive.

■ Finally, the CTA argues that no evidence was presented to support the jury award of $636,720 for lost earnings. In determining the amount of money that would fairly compensate the plaintiff, the jury was instructed to consider "[t]he value of time, earnings [and] salaries lost and the present cash value of the time, earnings [and] salaries reasonably certain to be lost in the future." See IPI Civil 3d No. 30.07. The first portion of this instruction concerns earnings prior to trial; the second portion includes impairment of the plaintiff's capacity to earn. See IPI Civil 3d No. 30.07, Comment. Because the plaintiff here continued to work at his regular job up until a short time before trial, the bulk of this award is necessarily for lost future earnings.

Plaintiff testified on his inability to work. At the time of the accident, he was employed as a freight elevator operator. Prior employment included work at a steel company, maintenance work, truck driving, and work as a meat cutter. He testified that, as an amputee, he could not do any of these jobs. He also stated that in the 12- to 18-month period prior to trial, his condition had worsened. He was weak, dizzy at times, and experienced pain in his right leg. Although plaintiff's employer originally made an effort to accommodate plaintiff's injuries, there was a subsequent change in the management company and a dispute arose concerning plaintiff's job duties. Plaintiff simply could not perform all the job functions he could prior to the accident. It is not entirely clear from the record whether plaintiff quit, was fired, or was forced out. Plaintiff's wife testified that plaintiff cannot work because of the pain in both legs.

Although Dr. Yongsmith did not testify directly concerning plaintiff's employment prospects, her testimony concerning nerve damage to his right leg, plaintiff's permanent loss of sensation and stability, and the possibility that his condition may worsen is relevant to the jury's determination of lost future earnings.

Additionally, Roderick Bashir, a representative of the union, which includes freight elevator operators, testified as to lost future

earnings and plaintiff's prospects of employment as a freight elevator operator. Bashir's testimony established that he was familiar with the union, the job of an elevator operator, the work performed by plaintiff, and the physical requirements for the job. He testified that the hourly wage for freight elevator operators was $10.95 and that, based on a 24-year history of such wages, the average hourly rate increase per year was 30 cents. He also testified that given plaintiff's physical condition, he is not employable as an elevator operator. Based on these historical wage figures and a projected 19-year work life for plaintiff, Bashir estimated lost future wages at approximately $563,000, plus an additional $73,000 for lost fringe benefits.

The CTA first maintains that Bashir was not disclosed as an expert. However, the CTA's brief is devoid of any argument on this issue. Rather, the CTA merely asserts in a conclusory fashion that Bashir's testimony was a "surprise expert opinion." Mere contentions, without argument or citations of authority, do not merit consideration on appeal and will be deemed waived. 155 Ill. 2d R. 341(e)(7); *McCleary v. Board of Fire & Police Commissioners*, 251 Ill. App. 3d 988, 995, 622 N.E.2d 1257 (1993).

As to the CTA's claim that Bashir's testimony was speculative, we disagree. Expert testimony as to lost earnings is not required. See *Tracy v. Village of Lombard*, 116 Ill. App. 3d 563, 575, 451 N.E.2d 992 (1983). "[T]o recover lost earnings, all that the law requires is evidence that will establish, with a fair degree of probability, a basis for assessing damages." *Levin v. Welsh Brothers Motor Service, Inc.*, 164 Ill. App. 3d 640, 656, 518 N.E.2d 205 (1987). Thus, where a plaintiff's former employer was informed about the business in which plaintiff was engaged, the employer's testimony as to that plaintiff's potential earnings was not so speculative, remote or uncertain as to make its admission error. *Levin*, 164 Ill. App. 3d at 656. Here, Bashir was informed about plaintiff's work as a freight elevator operator, the requirements for the position, and the wages paid. As in *Levin*, it cannot be said that Bashir's testimony was so speculative as to make its admission error.

Finally, the CTA claims that plaintiff failed to introduce evidence that he was not employable in any field, thus making the award of future lost earnings improper and plainly the result of passion or prejudice. As noted above, an award of future lost earnings includes consideration of the extent to which plaintiff's capacity to earn has been impaired. Impairment of earning capacity is the difference between the amount the plaintiff was capable of earning prior to his injury, and the amount he is capable of earning after the injury. *Patel v. Brown Machine Co.*, 264 Ill. App. 3d 1039, 1061, 637 N.E.2d 491

(1994). Plaintiff need not present expert testimony as to what employment opportunities are available to him. Loss of future earnings may be established through plaintiff's testimony alone:

> "[T]he general rule is that the appearance of the plaintiff on the witness stand, his testimony as to the nature of his injuries and their duration are sufficient to take the question of impaired earning capacity to the jury." *Patel*, 264 Ill. App. 3d at 1061.

See also *Shaheed v. Chicago Transit Authority*, 137 Ill. App. 3d 352, 360, 484 N.E.2d 542 (1985). Thus, evidence that plaintiff's injury was permanent and that it prevented him from continuing employment are generally sufficient to permit a jury to arrive at a calculation of lost future wages. *Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 116-17, 576 N.E.2d 918 (1991).

Here, the jury had the benefit of plaintiff's testimony, as well as the testimony of his wife, Mr. Bashir and Dr. Yongsmith. The jury could have concluded that plaintiff was unemployable. Plaintiff was 45 years old at the time of trial, a Polish immigrant, who lacked any formal education after age 15. The jury observed his injuries, as well as his lack of facility with the English language. The jury heard him testify that he could not perform any of the prior jobs he had held. A jury may draw on its own experience in evaluating a plaintiff's future employment potential. See *Patel*, 264 Ill. App. 3d at 1061-62. The jury fixed the amount of lost earnings at $636,720, thus reflecting its acceptance of Bashir's estimates and its determination that plaintiff was no longer able to work. Under these circumstances we cannot say that the jury's determination of lost future earnings was against the manifest weight of the evidence.

Based on the foregoing, we affirm the jury award in its entirety.

IV

■ We next consider the CTA's claim that the jury's apportionment of negligence 40% to Chavez and 60% to the CTA is not supported by the evidence. In a negligence action, a comparison of the parties' relative fault and allocation of liability are matters peculiarly within the province of the jury, which will not be disturbed on appeal unless contrary to the manifest weight of the evidence. *Junker v. Ziegler*, 113 Ill. 2d 332, 339-40 (1986); *McShane v. Chicago Investment Corp.*, 235 Ill. App. 3d 860, 876, 601 N.E.2d 1238 (1992). A verdict is against the manifest weight of the evidence where a contrary verdict is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based on the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992).

■ Here, the evidence adduced at trial established that the plaintiff was driving southwest on Archer Avenue within the posted

speed limit of 35 miles per hour, that the light was green as he approached the intersection of Archer and Halsted, and that the bus driver, who was facing north on Halsted, waved plaintiff through the intersection. Testimony also established that Chavez was driving northbound on Halsted at approximately 40 miles per hour, and that the light was red as he sped through the intersection. The precise location of the bus was never established, nor was there testimony, expert or otherwise, that demonstrated what plaintiff and Chavez might have been able to see had the bus been positioned behind the crosswalk, given the relative speed and position of the vehicles. Under these facts, the jury's allocation of 60% of the fault to the CTA is plainly unreasonable and contrary to the evidence.

Plaintiff proceeded on the theory that the CTA driver negligently positioned his bus in the intersection in violation of both state law (625 ILCS 5/11—306 (West 1994)) and a municipal ordinance (Chicago Municipal Code § 27—254 (1984)) and, further, negligently waved plaintiff through the intersection. Neither act of the CTA, considered alone, could provide a reasonable basis for the jury's allocation of 60% of liability to the CTA. Even considering the combined effect of these two purported acts, we cannot accept the proposition that the CTA's liability is greater than that of defendant Chavez, who was driving over the speed limit, ran a red light, and actually collided with plaintiff.

We reiterate that for purposes of this appeal the CTA has waived the question of duty and we therefore express no opinion as to whether the CTA was under a duty to use ordinary care when its driver waved plaintiff through the intersection. That is a matter best left to the trial court. We nonetheless note that whatever duty the CTA may be under by virtue of municipal ordinance, statute or otherwise, such duty does not somehow make the CTA liable in tort for the unlawful conduct of another motorist. In other words, a mere wave by the CTA bus driver does not amount to a guarantee or blanket assurance that all other vehicles in the area will obey the traffic laws. Just as plaintiff was entitled to presume that the cross-traffic on Halsted would obey the traffic signal (see *Boylan v. Martindale*, 103 Ill. App. 3d 335, 431 N.E.2d 62 (1982)), the bus driver was entitled to presume that a vehicle approaching the bus on the left would observe the law and stop at the red light. Moreover, there was no evidence from which the jury could conclude that the position of the bus and the conduct of the bus driver were in any way connected to the unlawful conduct of Chavez in running the red light. Thus, we cannot agree with plaintiff that the bus driver "should have foreseen that plaintiff could be struck by Chavez' vehicle." Although the CTA

may be a more attractive defendant than Chavez, the CTA is not the insurer of every accident that happens in close proximity to a CTA bus.

Accordingly, we remand this matter to the circuit court for a new trial on apportionment of liability.

## V

■ Finally, on motion taken with the case, the CTA asks this court to stay judgment interest for the period from June 28, 1995, to August 26, 1995. The CTA claims that plaintiff's counsel was dilatory in reviewing certain transcripts that were part of the record on appeal, resulting in a two-month delay in filing the record. Section 2—1303 of the Code of Civil Procedure governs interest on judgments and provides in relevant part:

"Judgments recovered in any court shall draw interest *** from the date of the judgment until satisfied ***. *** The judgment debtor may by tender of payment of judgment, costs and interest accrued to the date of tender, stop the further accrual of interest on such judgment notwithstanding the prosecution of an appeal, or other steps to reverse, vacate or modify the judgment." 735 ILCS 5/2—1303 (West 1994).

Section 2—1303 makes no provision for a suspension of interest where delays are experienced during the appeal process and we decline to carve out such an exception here. Rather, the statute provides only one method for a judgment debtor to stop the accrual of interest, and that is by tendering payment of the judgment, costs, and interest accrued to date. Here, however, there is no way for the judgment debtor, the CTA, to know how much money must be paid to stop the further accrual of interest until such time as the allocation of damages are determined on remand. Accordingly, judgment interest will not run until judgment is entered on the verdict rendered upon remand and the exact extent of the CTA's liability is settled. See *Decker v. St. Mary's Hospital*, 266 Ill. App. 3d 523, 525-26, 639 N.E.2d 1003 (1994); *Poe v. Industrial Comm'n*, 230 Ill. App. 3d 1, 5-10, 595 N.E.2d 593 (1992).

For all the foregoing reasons, we affirm the judgment of the circuit court of Cook County as to the amount of the damage award, but reverse and remand for a new trial as to apportionment of liability.

Affirmed in part; reversed in part and remanded.

McNULTY, P.J., and GORDON, J., concur.