FIFTH DIVISION

December 12, 1997

No. 1-96-0753

CARL E. LA FEVER,  )

  )

Plaintiff-Appellee/Cross-Appellant,  )

  )

v.  )        Appeal from

  )     the Circuit Court

KEMLITE COMPANY, a Division of DYROTECH   )      of Cook County.

INDUSTRIES, INC.,  )

  )

Defendant-Appellant/Cross-Appellee.  )

  )

__________________________________________)    No.  91-L-16362

  )

KEMLITE COMPANY, a Division of DYROTECH   )

INDUSTRIES, INC.,  )

  )

Third-Party Plaintiff-Appellant,  )

  )         Honorable

v.  )   James S. Quinlan, Jr.,

  )      Judge Presiding.

BANNER/WESTERN DISPOSAL, a Division of    )

WASTE MANAGEMENT OF NORTH AMERICA, INC.,  )

  )

Third-Party Defendant-Appellee.  )

MODIFIED UPON DENIAL OF REHEARING

JUSTICE THEIS delivered the opinion of the court:

Defendant and third-party plaintiff, Kemlite Company, a division of Dyrotech Industries, Inc., a wholly owned subsidiary of Crane Company, a New York corporation (Kemlite), appeals the jury verdict against it awarding damages for injuries sustained by plaintiff, Carl LaFever (LaFever), at Kemlite's fiberglass plant in Joliet, Illinois.  LaFever worked as an industrial waste disposal truck driver for Waste Management of Illinois, Inc., d/b/a Banner/Western Disposal (Banner/Western).  LaFever was injured when he slipped and fell while servicing the Kemlite facility for Banner/Western and filed suit alleging that Kemlite failed to maintain a walkway, failed to warn LaFever of a dangerous condition, and negligently allowed fiberglass waste, oil or hydraulic fluid, or fiberglass dust to accumulate on the walkway.  Kemlite filed a third-party action against Banner/Western alleging that LaFever's injuries were proximately caused by Banner/Western's negligence.  The case proceeded to trial and the jury awarded LaFever $1,122,261.21. 

On appeal, Kemlite alleges several trial errors and seeks reversal of the entire jury verdict, reversal for a new trial on all issues, or reversal and remand for a remittitur of the entire future lost earnings award.  Kemlite first argues that LaFever did not establish either duty or proximate cause to hold Kemlite liable in tort.  Kemlite also claims LaFever's counsel made improper remarks in closing argument.  In addition, Kemlite contends that the trial court erroneously instructed the jury as to LaFever's future lost earnings, and calculation of LaFever's life expectancy.  In the third-party action, Kemlite argues that the trial court erred by refusing to admit into evidence the contract between Kemlite and Banner/Western to show the contractual allocation of liability.  On cross-appeal, LaFever argues that the trial court erroneously allowed Banner/Western to waive and set off its workers' compensation lien in satisfaction of its contribution liability to Kemlite, post-trial.  For the following reasons, we affirm in part, reverse in part, and remand. 

Kemlite manufactures fiberglass reinforced polyester resin panels used in the transportation and building products industry.  At the Joliet facility, the panels are manufactured on eight production lines, 24 hours a day, in three shifts of eight hours each.  The edge trim of the hardened resin panels is the waste byproduct which is thrown into the compactor.  Kemlite contracted with Banner/Western to haul away all of Kemlite's waste.  At trial, the parties referred to the large industrial dumpster at issue as a closed compactor unit, a hydraulic unit with a ram located at one end.  Kemlite employees would dump the fiberglass debris into a four-foot pit in the top of the unit and the ram would then compact the debris from the side.

To remove a filled container, a Banner/Western driver would secure the container to keep the debris from spilling out.  The driver would then attach a cable in order to pull the waste container onto the back of the truck, first removing the pinning bar from the side of the container.  After removing the bar, which weighed approximately 40 pounds, the driver would disconnect the container by loosening two buckles that held the container to the compactor.  The driver would then climb back onto the truck and drive the truck forward to pull the container away.  Finally, the driver would get out of the truck and clean up any debris that spilled during removal.  Once the container was on the truck, the driver would take it to a landfill, empty it, and return the empty container back to the customer's site.  Banner/Western provided the containers and would pick up the full containers once a day.  If Kemlite requested, Banner/Western would make a second pick up on any given day.  

    At trial, much of the testimony concerned the fiberglass debris, how it was generated, and who was responsible for cleaning it up.  It was undisputed that the debris was slippery, like ice, and hard to handle because it was razor sharp.  Likewise, walking in the debris was unavoidable because all roll-off drivers had to walk through the debris to reach the back of the container in order to disconnect it from the compactor.  Debris often would spill as the Banner/Western drivers removed the container.  In those instances, the roll-off drivers acknowledged that it was their job to clean up the spilled debris.  If a lot of debris spilled during removal, the Banner/Western drivers would ask Kemlite for help to clean up the mess.  

In addition, however, several Banner/Western employees testified regarding the condition of the area around the compactor upon their arrival to the Kemlite plant.  For example, Raymond Richards testified:

"Q  Mr. Richards, to your understanding, is it Kemlite's job to maintain and clean that compactor area? 

*   *   *

THE WITNESS:  What I could say is when we leave, we clean it up the best way possible, but the mess is there when we get there, so it's really not my responsibility.  It's their's.

*   *   *

Q  Would it also be fair to say that it was a problem area and you did encounter debris when you tried to do your job?

A  Yes.

Q  Sometimes it would be fine for a couple days and then be right back to the way it was?

A  Yes.

Q  Did you ever ask the Kemlite people either in the dock, loading dock area, or the people who signed your ticket to try not to over stuff that box?

A  Yes.

Q  Why did you do that?

A  It's dangerous, number one, and it just makes a complete mess when it's over packed.

Q  It makes what?

A  Just a complete mess when it's over packed.  There is no way in controlling what's in that hopper.

Q  Would you let the dispatcher know every time when the packer was overloaded?

A  Yes."

Lynn Smith, a Banner/Western dispatcher, confirmed that the drivers often called her to report that debris was on the ground when the drivers arrived.  Smith never received a complaint from Kemlite that the Banner/Western drivers were not doing their job cleaning up spills they themselves caused during removal.

Regarding Kemlite's responsibility to maintain the compactor area, Kemlite's production superintendent, Edgar Johnson, testified:

"Q  All right, okay.  And it's the job of the utility workers within the Production Department of Kemlite to maintain that compactor area, correct?

A  If they see something that needs cleaned, yes.

*   *   *

Q  And if there was a necessity out there for a cleanup, if you've got a mess that people can trip on that was a hazard, somebody should be assigned to clean up that compactor area, correct?

A  If we're aware of it, yes."

Kemlite utility workers would use shovels and rakes to clean up flakes and pieces of fiberglass on the ground.  Johnson never received any complaints from Banner/Western nor complained to Banner/Western about the servicing of the compactor box.

Regarding the respective duties of Kemlite and Banner/Western, Banner/Western's operations manager, Terry Wilder, testified on cross-examination:

"Q  All right.  Do you recall Mr. LaFever had made complaints about that site before he was injured to you?

THE WITNESS:  Yes.

*   *   *

Q  And other drivers besides Mr. LaFever also complained to you about the Kemlite site, correct?

A  Yes.

Q  All right.  And some of the problems that result out there is that Kemlite may dump a container of material into the hopper into the compactor unit and just due to the density of it the ram will not push the material into the unit and consequently you cannot pin the container to hold the material in the box and when this happens a big mess results, correct?

A  That's correct.

*   *   *

Q  Kemlite's job in their maintenance department is to service the grounds at Kemlite and to take care of that compactor area, correct?

A  Yes, I assume.

*   *   *

Q  And the problems you would call Kemlite with would be too much debris around the compactor, correct?

A  Yes.

Q  And your men couldn't pin the box because it had been overstuffed, correct?

A  Yes.

Q  And the box was put back in and the area hadn't been cleaned when your men were off taking the load to the landfill, correct?

A  Yes.

Q  And you yourself, sir, said you can't shovel this material, right?

A  Yes, it is very difficult.

Q  You almost have to rake it, right?

A  Yes."

LaFever testified that, prior to his injury in 1990, he had been a Banner/Western employee for 21 years and a roll-off driver for 16 to 18 years.  Banner/Western held safety meetings to teach the roll-off drivers how to be careful and supplied its drivers with a shovel and special shoes for slippery areas.  LaFever was told that if he ever encountered an unsafe situation that he should call Banner/Western first for instructions.  LaFever encountered fiberglass debris and water on the ground at the Kemlite facility numerous times.  LaFever would notify the dispatcher who in turn would call Kemlite and ask for help in cleaning up the mess.  In his deposition, LaFever had stated that he would report the debris to Banner/Western and that he had never spoken to any Kemlite employee about the conditions. 

Regarding his fall, LaFever testified on cross-examination:

"Q  Now you didn't call anyone to clean anything up on June 22nd, 1990?

A  No.  The debris was there when I arrived.

Q  You had a shovel on the truck?

A  Yes, sir.

Q  Did you make yourself a path so you wouldn't slip on the debris before you walked to the back of the truck?

Q  No, sir, I did --

A  You could do that with a shovel, couldn't you?

Q  Probably, yes, I could.

*   *   *

Q  You are saying that Kemlite's employees at times, you don't know about the date of the accident, but at times would spill some fiberglass debris from the loading dock?

A  Yes, sir."

LaFever was not distracted by anything when he fell.  He could see clearly and the bar and pin he was carrying did not impede his vision as to where he was walking.  After his fall at Kemlite, LaFever completed two other loads.

Regarding prior back injuries, LaFever testified that he had injured his back on three earlier occasions: once in 1974, in 1983, and again in 1984.  LaFever returned to work after all three injuries.  LaFever testified that he saw Dr. Payne and Dr. Ibrahim for the last injury and recounted his prior injuries to them.  LaFever did not mention the last injury in his deposition or answers to interrogatories. 

During his entire employment with Banner/Western, LaFever had certain lifting restrictions.  LaFever testified that the pain from this fall was different from that suffered with prior injuries in that he felt sharp pain down to his feet.  The pain worsened after the fall.  LaFever was examined by Dr. Timothy Payne, who ordered a battery of medical tests.  Dr. Payne sent LaFever to physical therapy and gave LaFever medication and epidural injections for the pain.  Dr. Payne recommended that LaFever return to work.  LaFever worked for several months as a security guard, but the pain in his legs prevented him from continuing the job.

By evidence deposition, Dr. Timothy Payne, LaFever's treating physician, testified that LaFever first came to see him June 29, 1990, about a week after his fall.  LaFever apprised Dr. Payne of only one prior incident when LaFever had sustained a pulled muscle.  In Dr. Payne's opinion, LaFever's fall did not cause any of his degenerative back conditions, but, rather, was a final insult to his preexisting back condition.  Dr. Payne referred LaFever to a work-hardening program.  After continuing complaints, Dr. Payne referred LaFever to an orthopedic surgeon, Dr. Kamal Ibrahim, who recommended spine fusion surgery.  After surgery, LaFever returned to physical therapy, rehabilitation and work hardening.  According to Dr. Payne, because LaFever had done well at work hardening, LaFever "could attempt a return to his original job if it indeed was available." 

According to Dr. Ibrahim, who also testified by evidence deposition, the surgery was successful.  Regarding whether he instructed LaFever to return to work, Dr. Ibrahim testified that he did not have a specific instruction in his records.  Dr. Ibrahim would give a routine instruction after surgery to avoid lifting weight more than 50 pounds above the waist and 20 pounds above their head.  Dr. Ibrahim further stated, "My record here shows that I advised him to go back to work after he told me that he went through work hardening.  So although I don't have any recollection, but I wonder if I have discussed with him the weights of the job.  I don't know."

LaFever attempted to return to work at Banner/Western.  He was told, however, that he had been absent longer than one year, as allowed by his union contract, and, therefore, Banner/Western no longer needed him.  LaFever testified that he could not have returned to work during the one-year period due to the injury he sustained at Kemlite.  LaFever tried bartending and working on a tow truck, but both jobs bothered his back.  In 1995, LaFever returned to Dr. Payne but did not apprise him of any of his continuing back problems.

Kemlite called Dr. Elizabeth Sterna Kessler, who testified that she believed that, prior to June 1990, LaFever had significant degenerative changes in his lower back.  
If LaFever had sustained any injury from the fall, it would have been aggravation of a preexisting condition.  Kemlite also called the two treating physicians who treated LaFever for his 1983 and 1984 falls, respectively.  Both testified that x-rays taken in 1983 and 1984 revealed that LaFever had spondylolysis and spondylolisthesis, degenerative vertebrae and back conditions.

At the close of LaFever's case, Kemlite made a motion for a directed verdict, which the trial court denied.  At the close of Kemlite's case in chief, third-party defendant Banner/Western filed a motion for a directed verdict, which the court denied.  At the close of all the evidence, Kemlite and Banner/Western filed motions for directed verdict and LaFever filed a motion for a directed verdict against Kemlite on liability.  The court denied those motions as well.

The court then held a jury instruction conference.  Kemlite objected to the verdict form and instructions regarding future damages and future loss of earnings.  Specifically, Kemlite argued that, although LaFever testified that he tried to work, he did not say he could not work.  The court determined that there was enough evidence to send it to the jury and gave the verdict form and general IPI instructions over objections by Kemlite and Banner/Western.  As to duty, the court explained that, while Kemlite, as an owner of the property, had a duty to exercise ordinary care to see that the property was reasonably safe (IPI Civil 3d No. 120.02.01 (1995)), LaFever also had a duty to use ordinary care for his own safety (IPI Civil 3d No. B10.03 (1995)).

The jury returned a verdict in favor of LaFever in the amount of $1,122,261.21, accounted for as follows:  disability and disfigurement $75,000; past pain and suffering $250,000; future pain and suffering $250,000; medical expenses $92,117.61; past lost earnings $163,117.20; and future lost earnings $292,026.40.  The jury also apportioned fault as follows:  LaFever - 5%; Kemlite - 75%; Banner/Western - 20%.  The court reduced the award by 5% and entered judgment against Kemlite in the amount of $1,066,148.15.

Kemlite and Banner/Western both filed post-trial motions seeking judgments notwithstanding the verdict, remittitur for the entire future lost earnings award, and setoff of Banner/Western's worker's compensation lien in satisfaction of its contribution owed to Kemlite.  The court denied both post-trial motions but allowed Banner/Western to waive its worker's compensation lien in the amount of $222,267.02 to set off its contribution liability to Kemlite under the third-party complaint.  Accordingly, the court modified the jury verdict and reduced it to $843,881.13.

On appeal, Kemlite first argues that the trial court erred by failing to grant Kemlite's motions for a directed verdict at the close of LaFever's case in chief and again at the close of all of the evidence.  Specifically, Kemlite contends that it had no duty of care toward LaFever because the danger was open and obvious.  LaFever concedes that the danger was open and obvious, but argues that the open and obvious doctrine does not eliminate Kemlite's duty of reasonable care.

Motions for a directed verdict and judgments notwithstanding the verdict should only be granted when all of the evidence, viewed most favorably for the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967).  Whether a defendant has a duty of care is a question of law subject to 
de
 
novo
 review.  
Bucheleres v. Chicago Park District
, 171 Ill. 2d 435, 445, 665 N.E.2d 826, 831 (1996).  The question of duty concerns whether the defendant and plaintiff stood in such a relationship to each other that the law imposed upon defendant an obligation of reasonable conduct for the benefit of the plaintiff.  
Ward v. Kmart Corporation
, 136 Ill. 2d 132, 139, 554 N.E.2d 223, 226 (1990).  

Historically, landowners owed no legal duty to take precautions or warn against risks from open and obvious conditions on the land.  
Genaust v. Illinois Power Co.
, 62 Ill. 2d 456, 343 N.E.2d 465 (1976).  Relying on the Restatement (Second) of Torts, however, the Illinois Supreme Court has tempered this rule holding that the open and obvious doctrine no longer operates as a 
per
 
se
 bar to a landowner's or occupier's reasonable duty of care.  
Ward
, 136 Ill. 2d at 145, 554 N.E.2d at 229.  Section 343A of the Restatement provides that "[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."  Restatement (Second) of Torts §343A, at 218 (1965).

Relying on Comment 
f
 to this subsection, Illinois courts have culled two specific exceptions to the open and obvious doctrine--the "distraction exception" and the "deliberate encounter exception."  The "distraction exception" finds that a landowner's duty of care is not negated by an open and obvious condition when the possessor has reason to expect that the invitee's attention may be distracted from such condition.  
Ward
, 136 Ill. 2d at 145, 554 N.E.2d at 229; see 
American National Bank & Trust Co. v. National Advertising Co.
, 149 Ill. 2d 14, 18, 594 N.E.2d 313, 314 (1992); 
Deibert v. Bauer Brothers Construction Co., Inc.
, 141 Ill. 2d 430, 566 N.E.2d 239 (1990).  The second exception, known as the "deliberate encounter" exception, arises when "the landowner has placed the invitee in the position of having to choose between encountering the obvious danger or foregoing his employment" (
Burse v. CR Industries, Inc.
, 288 Ill. App. 3d 48, 53, 680 N.E.2d 431, 435 (1997), citing 
Jackson v. Hilton Hotels Corp.
, 277 Ill. App. 3d 457, 464, 660 N.E.2d 222, 226
 (1995)) and has been applied when the plaintiff had no reasonable alternative but to encounter the condition.   

Although neither recognized exception applies to the facts of this case, we nevertheless find, relying on the language of the Restatement, that Kemlite owed a duty of care to LaFever notwithstanding the open and obvious nature of the fiberglass debris.  The relevant inquiry is whether Kemlite's "general duty of reasonable care extended to the risk encountered" by LaFever.  
Ward
, 136 Ill. 2d at 145, 554 N.E.2d at 229.  An open and obvious condition is but one factor to consider in determining the owner's duty of care.  
Bucheleres
, 171 Ill. 2d at 456, 665 N.E.2d at 836.  Consequently, we consider the open and obvious nature of the condition in conjunction with the traditional factors determinative of duty.  
Bucheleres
, 171 Ill. 2d at 456, 665 N.E.2d at 836.

The first consideration is the likelihood of the injury.  
Ward
, 136 Ill. 2d at 140-41, 554 N.E.2d at 226-27.  When the condition is open and obvious, the likelihood of injury generally is considered to be slight because people encountering the condition are expected to appreciate and avoid the risks.  
Bucheleres
, 171 Ill. 2d at 456, 665 N.E.2d at 836.  In this case, part of LaFever's job removing the container required him to encounter whatever debris Kemlite allowed to accumulate.  Thus, this prong is not dispositive.  While the debris was open and obvious, LaFever could not avoid it.

The second consideration is the foreseeability of harm to others.  
Bucheleres
, 171 Ill. 2d at 456, 665 N.E.2d at 836.  It is this prong we find to be dispositive.  As adduced at trial, the evidence demonstrated that Kemlite often overloaded the compactor, allowing the fiberglass debris to overflow and accumulate on the ground.  The Banner/Western drivers testified that, while they were responsible for cleaning all spills caused by removing the container, it was Kemlite's job to maintain the compactor area.  Although Kemlite personnel testified that they never received complaints, the Banner/Western employees testified that they made repeated complaints to Kemlite regarding the compactor being overpacked and the area around the compactor.  It was foreseeable to Kemlite that allowing the slippery fiberglass debris to accumulate on the ground would cause someone to slip and fall.  The foreseeability of injury was magnified by Kemlite's notice from the Banner/Western dispatcher as well as by Kemlite's control over the hazardous condition.

Likewise, the magnitude of the burden of guarding against injury is slight.  Kemlite's production operated 24 hours a day and debris was constantly generated.  Kemlite could have scheduled an additional pickup by Banner/Western.  Kemlite could have kept the area around the compactor clean.  Kemlite's production supervisor testified that Kemlite had utility workers to keep the premises clean.

And finally, the consequences of placing that burden upon Kemlite also are slight.  
Ward
, 136 Ill. 2d at 140-41, 554 N.E.2d at 226-27.  The duty imposed in this case does not require Kemlite to insure against all injuries but, rather, to exercise reasonable care.  Kemlite had control over the filling of the compactor and notice from Banner/Western employees regarding the unsafe accumulation of fiberglass debris around the compactor.  Thus, we find the trial court did not err in refusing to direct a verdict in favor of Kemlite.  The court correctly determined that Kemlite owed LaFever a duty of care despite the open and obvious nature of the debris.  Kemlite's duty of reasonable care encompassed the risk that someone would be injured because of the accumulated fiberglass debris.  
Ward
, 136 Ill. 2d at 157, 554 N.E.2d at 234.

As a related matter, Kemlite claims that LaFever did not prove that his June 1990 fall proximately caused his back injuries.  The issue of proximate cause is a question of fact for the trier of fact.  In this case, both treating physicians, Dr. Payne and Dr. Ibrahim, testified that the fall and symptoms were likely related.  Both agreed that LaFever's degenerative condition was in place prior to LaFever's fall in 1990 and that the fall aggravated the preexisting degenerative condition triggering LaFever's pain symptoms.  Likewise, although Kemlite's expert, Dr. Kessler, testified that she did not believe the fall was related to LaFever's symptoms, Kessler did concede that, if
 related, then the fall would have aggravated preexisting conditions.  The jury's finding that the fall was the proximate cause of LaFever's injury was not against the manifest weight of the evidence.  
Moore v. Anchor Organization for Health Maintenance
, 284 Ill. App. 3d 874, 880, 672 N.E.2d 826, 831 (1996).

Kemlite next argues that the trial court erred by refusing to admit into evidence the purchase order between Kemlite and Banner/Western to demonstrate the par
ties' allocation of liability.  The admission of evidence lies within the sound discretion of the trial court.  
Polk v. Cao
, 279 Ill. App. 3d 101, 103, 664 N.E.2d 276, 278 (1996).  Here, the court noted numerous problems with Kemlite's purchase order, including that the paper was blank on one side and it did not evidence a contract with anyone.  Counsel for Kemlite admitted the copy was illegible.  Thus, the trial court did not abuse its discretion by refusing to admit the purchase order into evidence.

Kemlite also asserts that prejudicial, untrue remarks made by LaFever's counsel during closing argument warrant a new trial.  Specifically, Kemlite objects to the following statement made by Lafever's counsel as untrue:  "They had to hire Dr. Kessler.  The only neurologist in the world?  First of all, they didn't have to hire her.  They had to get a continuance of this trial a month ago so they could get her in this case."  Although the court sustained Kemlite's objection at trial, Kemlite argues that the remark constitutes reversible error.  We disagree.  While the remark was improper, it did not alter the jury's verdict.

As to LaFever's damages, Kemlite first contests the jury award, in the amount of $250,000, for future pain and suffering.  At trial, Dr. Payne testified that LaFever would likely continue to experience aches, pains, and discomforts in his lower back.  Likewise, LaFever testified as to his continuing minor pain, stiffness, and loss of flexibility.  From the evidence, the jury reasonably could find that LaFever would continue to experience future pain and suffering.  The jury's award for future pain and suffering was not against the manifest weight of the evidence.  

Kemlite next argues that the trial court erred by instructing the jury regarding future lost earnings and by allowing the jury to calculate LaFever's future lost earnings.  Kemlite argued that LaFever's evidence did not indicate that LaFever could not work, but rather that he tried a couple of jobs which did not work out.  The trial court admitted the evidence was not strong but determined there was probably a minimum basis to support such an instruction.  Over Kemlite's objection, the court gave the jury instructions regarding the nature and amount of damages, and how to calculate future lost earnings.

Although expert testimony as to future earnings is not required, there must be some evidence that plaintiff's injury was permanent and that it prevented him from continuing employment.  
Antol v. Chavez-Pereda
, 284 Ill. App. 3d 561, 573-74, 672 N.E.2d 320, 329 (1996).  Plaintiff must present "reasonably certain proof" as to future damages.  
Brown v. Chicago & North Western Transportation Co.
, 162 Ill. App. 3d 926, 936, 516 N.E.2d 320, 327 (1987).  "[T]he appearance of the plaintiff on the witness stand, his testimony as to the nature of the injuries and their duration are sufficient to take the question of impaired earning capacity to the jury."  
Patel v. Brown Machine Co.
, 264 Ill. App. 3d 1039, 1061, 637 N.E.2d 491, 505 (1994)).  Courts also have acknowledged the physical nature of the disability (
Antol
, 284 Ill. App. 3d at 574, 672 N.E.2d at 329 (leg amputated below the knee); 
Patel
, 264 Ill. App. 3d at 1062, 637 N.E.2d at 506 (severed fingers)
) and have relied on physician testimony as to the permanence of the disability.  
Patel
, 264 Ill. App. 3d at 1062, 637 N.E.2d at 506; 
Lewis v Cotton Belt Route
, 217 Ill. App.3d 94, 117, 576 N.E.2d 918, 936 (1991).  Thus, while plaintiff may testify as to his impaired earning capacity, that testimony must include some reasonably certain proof of the impairment.

In this case, both treating doctors testified that the surgery was successful in eliminating LaFever's symptoms and that LaFever could return to work without restriction.  Dr. Payne testified that he believed LaFever "could attempt a return to his original job if it indeed was available for he had good flexibility, he could lift repetitively up to 25 pounds and intermittently up to 50 pounds, and he wasn't having the complaints of pain that he had prior to surgery."  Due to union rules, however, because LaFever had been off of work for a year, he was unable to return to his prior position as a Banner/Western roll-off driver.  LaFever briefly worked as a bartender and a wrecker driver but, according to his own testimony, was unable to perform either job.  LaFever presented no other evidence regarding his inability to work in the future.  Moreover, both doctors testified that LaFever could return to work.  Without some reasonably certain proof as to LaFever's continued incapacity, we find that the trial court abused its discretion by sending the issue of future lost earnings to the jury.  Consequently, the jury also should not have been instructed regarding calculation of LaFever's future lost earnings. 

On cross-appeal, LaFever argues that the trial court erred by allowing Banner/Western a post-trial setoff of its contribution liability to Kemlite by waiving its statutory workers' compensation lien.  Specifically, LaFever contends that the post-trial setoff allowed Banner/Western to circumvent its statutory obligation to pay its 
pro
 
rata
 share of LaFever's fees and expenses.  As this issue presents a question of law, our review is 
de
 
novo
.  
Corley v. McHugh Construction Co.
, 266 Ill. App. 3d 618, 621, 639 N.E.2d 1374, 1377 (1994).    

Under the Workers' Compensation Act, an employer must pay its employees compensation for accidental injuries which arise out of and in the course of employment.  820 ILCS 305/2 (West 1994).  The Act grants the employer a statutory lien on the proceeds an employee recoups from a third party, which is equal to the amount of workers' compensation benefits paid or owed to the employee.  820 ILCS 305/5(b) (West 1994).  The employer's right to reimbursement is known as the workers' compensation lien.  
Corley
, 266 Ill. App. 3d at 621, 639 N.E.2d at 1377.

If, however, the employer exercises its right to reimbursement
, the employer is obligated to pay its 
pro
 
rata
 share of the employee's fees and expenses for such recovery.  820 ILCS 305/5(b) (West 1994).  "[T]he rationale for imposing this obligation on the employer is that the employer receives a benefit as a result of the employee's having prosecuted the third-party action, namely, reimbursement."  
Ramsey v. Morrison
, 175 Ill. 2d 218, 239-40, 676 N.E.2d 1304, 1314 (1997).

Additionally, an employer may also be held liable for contribution by a third party.  An employer's contribution liability is limited to the amount of the employer's workers' compensation liability to its injured employee.  
Kotecki v. Cyclops Welding Corp.
, 146 Ill. 2d 155, 585 N.E.2d 1023 (1991).  Thus, an employer may use the Workers' Compensation Act as a shield from third-party actions (
Braye v. Archer-Daniels-Midland Co.
, 175 Ill. 2d 201, 208, 676 N.E.2d 1295, 1299 (1997)), for example, by waiving its workers' compensation lien.  The instant case questions the interplay between an employer's contribution liability and an employer's workers' compensation lien.  Although two recent cases touched on this issue, neither resolved the issue fully.

In 
Ramsey v. Morrison
, 175 Ill. 2d 218, 676 N.E.2d 1304 (1997), the Illinois Supreme Court held that an employer may not reduce its contribution liability by its 
pro
 
rata
 share of the employee's fees and costs for recovery against the third party.  In so holding, the court explained that an employer's worker's compensation liability is defined by the amount of benefits the employer owes under the Workers' Compensation Act, not by the amount of reimbursement the employer is entitled to recover from the employee.  
Ramsey
, 175 Ill. 2d at 239, 676 N.E.2d at 1314.  Similarly, in 
Corley v. James McHugh Construction Co.
, 266 Ill. App. 3d 618, 639 N.E.2d 1374 (1994), the appellate court held that an employer's section 5(b) 
pro
 
rata
 share of the employee's attorney fees and costs may not be deducted from the setoff when the employer waived its workers' compensation lien.  In so holding, the court relied on the fact that the employer had not exercised its right to reimbursement because it had waived its workers' compensation lien pretrial.  

This case presents the propriety of allowing the employer to waive its workers' compensation lien post-trial, an issue never addressed.  Applying the reasoning of 
Ramsey
 and 
Corley
, we find that Banner/Western may not avoid its fees and costs obligation to LaFever by post-trial waiver of its workers' compensation lien and setoff of its contribution liability to Kemlite.  
Ramsey
 reaffirms that an employer's contribution liability and workers' compensation liability are two separate obligations.  
Ramsey
, 175 Ill. 2d at 239, 676 N.E.2d at 1314.  Likewise, 
Corley
 explains that an employer's workers' compensation lien constitutes a right to reimbursement.  
Corley
, 266 Ill. App. 3d at 621, 639 N.E.2d at 1377.  Consequently, any claimed waiver of that right must be considered in light of the plaintiff's recovery from a third party.  After plaintiff recovers from a third party, the employer's right to reimbursement is statutorily reduced under section 5(b) by the employee's entitlement to a proportionate share of fees and costs.  Thus, Banner/Western's post-trial setoff of its contribution liability by the full amount of its workers' compensation lien does not account for the statutory reduction in its right to reimbursement as contemplated by section 5(b) of the Act.

In this case, the trial court allowed Banner/Western to waive its workers' compensation lien post-trial in the full amount of $222,267.02 in satisfaction of its contribution liability to Kemlite for $224,452,24.  The court thus reduced the judgment by the full setoff amount, reducing LaFever's recovery from $1,066,148.15 to $843,881.13.  By so doing, Banner/Western avoided responsibility for $58,599.92 in fees and costs to LaFever (calculated by LaFever as $55,566.75 (25% x $222,267.02) plus $3,033.17, Banner/Western's 
pro
 
rata
 share of LaFever's litigation expenses).  While Banner/Western could have waived its lien pretrial, by waiting post-trial, Banner/Western gambled that there would be no recovery at all.  When the respective liabilities of the parties are determined, Banner/Western must reduce the amount of its workers' compensation lien by the proportionate amount of fees and costs owed to LaFever for prosecuting the lawsuit.  
Rice v. McDonald's Corp.
, 268 Ill. App. 3d 201, 644 N.E.2d 482 (1994).

We recognize that the practical effect of this decision will be to hold employers potentially responsible for 125% of their workers' compensation liability.  We believe, however, that, under these narrow facts, the employer should not be allowed to circumvent payment of its section 5(b) fees and costs, after the cause has proceeded through trial.  Accordingly, we vacate that portion of the trial court order allowing Banner/Western to waive and set off its workers' compensation lien without accounting for the statutory fees owed to LaFever.   

Affirmed in part and reversed in part; remanded for recalculation of the judgment consistent with this opinion.

GREIMAN and ZWICK, JJ., concur.